**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JUNE 18, 2026

*Stephens, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 18, 2026

*Sarah Pendleton*

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 103748-1 |
| Respondent, | EN BANC |
| v. | |
| META PLATFORMS, INC., formerly doing business as FACEBOOK, INC., | Filed: June 18, 2026 |
| Petitioner. | |

PER CURIAM[1]— This case concerns the application of the Fair Campaign Practices Act (FCPA), former ch. 42.17A RCW (2024), to petitioner Meta Platforms Inc. As explained below, the resolution favored by the majority of this court is to affirm the Court of Appeals with respect to Meta's liability for violating the FCPA. However, there is no majority view with respect to the resulting civil penalty. Therefore, the penalty judgment stands affirmed.

---

[1] This court may issue a per curiam opinion summarizing the votes of the justices in a plurality decision, preceding the lead opinion. WASH. SUP. CT. INTERNAL R. II-8(B).

Members of the public requested information from Meta regarding certain political advertisements on its platforms. Meta does not dispute that its response to these requests violated the FCPA and its implementing regulations. The State of Washington brought this action against Meta, and both parties moved for summary judgment. The trial court granted summary judgment to the State, ruled that Meta was liable for violating the FCPA, and imposed a civil penalty. The Court of Appeals affirmed in a published opinion. *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138, 560 P.3d 217 (2024).

On review in this court, Meta argues that (1) the ruling on liability should be reversed because the FCPA and its implementing regulations violate the First Amendment to the United States Constitution as applied, (2) the penalty calculation should be reversed because it is based on a misinterpretation of the relevant statutes, and (3) the penalty should be reversed because it violates the excessive fines clause of the Eighth Amendment to the United States Constitution.

As to the first issue, in the lead opinion, three justices (Justice Whitener, Chief Justice Stephens, and Justice Pro Tempore Yu) would apply exacting scrutiny, uphold the FCPA as applied, and affirm the ruling on liability. In the opinion concurring in part and dissenting in part, three justices (Justice Mungia, Justice González, and Justice Montoya-Lewis) would apply deferential scrutiny, uphold the FCPA as applied, and affirm the ruling on liability. In the dissenting opinion, three

justices (Justice Gordon McCloud, Justice Johnson, and Justice Pro Tempore Madsen) would reverse the ruling on liability and remand to the trial court for fact-finding on Meta's First Amendment claim. As a result, the lead opinion and the concurrence/dissent represent the majority view affirming the ruling on liability.

As to the second issue, the three-justice lead opinion would affirm the penalty and hold that the trial court correctly interpreted and applied the relevant statutes by counting each advertisement included in a request as a separate violation. The three-justice concurrence/dissent would reverse the penalty and hold that the number of violations should be based on the number of advertisements, regardless of the number of requests that were made for the same information. The three-justice dissent would hold that the trial court correctly interpreted the relevant statutes but does not join the lead opinion in affirming the penalty. As a result, there is no majority view to affirm or reverse on this issue and the judgment stands affirmed.

As to the third issue, the three-justice lead opinion would affirm the penalty and hold that it does not violate the excessive fines clause of the Eighth Amendment, assuming without deciding that the Eighth Amendment applies in this case. The three-justice concurrence/dissent joins the lead opinion on this issue, assuming without deciding that the Eighth Amendment applies. The three-justice dissent would reverse the penalty and hold that it violates the excessive fines clause of the

Eighth Amendment. As a result, the lead opinion and the concurrence/dissent represent the majority view that the penalty does not violate the Eighth Amendment.

Accordingly, the Court of Appeals' opinion is affirmed with respect to liability and the penalty judgment stands affirmed by a divided court.

**IN THE SUPREME COURT OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 103748-1 |
| Respondent, | En Banc |
| v. | |
| META PLATFORMS, INC., formerly doing business as FACEBOOK, INC., | Filed _____ |
| Petitioner. | |

WHITENER J. – Washington State has a long history of requiring parties to election-related communications to publicly disclose information about their advertisements to help voters make fully informed choices. To best promote this interest in election transparency, Washington amended the Fair Campaign Practices Act (FCPA), former ch. 42.17A RCW (2024),[1] to require digital communications platforms to publicly disclose some of the data they regularly collect on a small

---

[1] Former chapter 42.17A RCW has since been recodified as Title 29B RCW, effective January 1, 2026. Former chapter 42.17A RCW will be referenced throughout as it applied to Meta at the time of the action.

subset of their advertisements: "political advertising and electioneering communications" targeted at Washington State users.

Meta Platforms Inc., one of the wealthiest corporations in the world, controls platforms like Instagram, Facebook, WhatsApp, and Messenger. Billions of people across the globe consume content posted on Meta's platforms every day, including countless advertisements chosen specifically for them using "microtargeted advertising" based on their demographic information and browsing habits.

In this case, Meta asks this court to find the FCPA as applied to them is burdensome and violates their right to free speech as protected by the First Amendment to the U.S. Constitution. We hold that it does not.

FACTUAL AND PROCEDURAL BACKGROUND

This action concerns 12 separate requests for records from three members of the public: Eli Sanders, Tallman Trask, and Zach Wurtz. Clerk's Papers (CP) at 256-64. Meta does not dispute that its response to the requests for records violated the disclosure law. CP at 5859-63. The Attorney General's Office filed a complaint in King County Superior Court in April 2020 and later amended it to include additional charges. CP at 1-16, 247-69. Following discovery, both parties moved for summary judgment in July 2022. CP at 379-412, 413-44. The superior court granted the State's motion for summary judgment. CP at 5571-79.

The disclosure law authorizes up to $10,000 in penalties for each violation, plus legal costs. Former RCW 42.17A.750(1)(c) (2019), .780 (2018). The superior court imposed the maximum penalty for each advertisement sought in a request, a total of 822 violations.[2] *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138, 194, 560 P.3d 217 (2024). Additionally, finding that Meta intentionally violated the law, the superior court trebled both the civil penalties and legal fees as permitted by the statute. *State v. Meta Platforms, Inc.*, No. 20-2-07774-7 SEA, 2022 WL 20697995 (King County Super. Ct. Oct. 6, 2022); CP at 5571-79. The superior court assessed $24,660,000.00 in civil penalties and $10,522,159.59 in legal costs for a total of $35,182,159.59, plus granted the State's request for an injunction. CP at 5592-93, 5812.[3]

Meta argued to the Court of Appeals that the disclosure law violates the federal First Amendment and section 230 of the Communications Decency Act. Am. Appellant's Opening Br. at 19-60 (Wash. Ct. App. No. 84661-2-I (2023)). It further argued that the superior court's method of calculating damages was based on an improper reading of the statute because it authorizes a penalty only for each *request* Meta does not respond to, not each advertisement included in those requests. *Id.* at

---

[2] The superior court found that Meta committed 254 violations in response to two plaintiffs' 2019 requests, 157 violations in response to one plaintiff's 2021 request, and 411 violations in response to another 2021 request. CP at 5575.

[3] The injunction is currently stayed. *Meta*, 33 Wn. App. 2d at 146.

60-66. Meta also claimed that the fine was so excessive as to violate the Eighth Amendment to the U.S. Constitution. *Id.* at 73-74. The Court of Appeals found in the State's favor on all issues. In its petition to this court, Meta renews its federal First and Eighth Amendment challenges, as well as its statutory misinterpretation claim regarding the calculation of damages.

Meta, the parent company of social media sites Facebook, Instagram, and other platforms, sells advertising space to individuals and organizations. CP at 5858-59. Meta does not dispute that as a "digital communications platform" and a "commercial advertiser" it is subject to the disclosure law. WAC 390-18-050(7)(g); former RCW 42.17A.345 (2019); Am. Appellant's Opening Br. at 10 (Wash. Ct. App. No. 84661-2-I (2023)); *see also Meta*, 33 Wn. App. 2d at 152 n.7. Advertisers use Meta to target narrow groups of users based on traits like age, gender, and location, a concept known as "microtargeting." CP at 599-601, 6344-59, 7164, 7184. As microtargeted advertising has become more prevalent, some parties have raised concerns about how it will impact voters and election transparency. CP at 7214, 7218; *see also* Br. of League of Women Voters of Wash. et al. as Amici Curiae in Supp. of Resp't at 7-12. Potential risks include increased political polarization and the ease of spreading misinformation, risks now heightened by the rise of artificial

intelligence. Br. of League of Women Voters of Wash. et al. as Amici Curiae in Supp. of Resp't at 7-12.

In December 2018, Meta received a $200,000 penalty for failing to respond fully to two requests under Washington's disclosure law. CP at 26-28. Shortly after, Meta announced it would no longer accept advertisements in Washington State that related to "candidates, elections or ballot initiatives." CP at 615. According to Meta, the disclosure law is so burdensome that there is no economic incentive to carry political advertisements in the state. Suppl. Br. of Pet'r at 10. However, such advertisements have continued to appear on Meta platforms since the ban. CP at 5859, 5937-38, 5974, 6010-11, 6015, 6025-26.

In 2018, Meta created an "Ad Library" to comply with disclosure laws in multiple jurisdictions. CP at 606-07, 7008, 7305-06. The "Ad Library" is a free tool that allows anyone to view information about advertisements hosted on Meta platforms that concern "social issues, elections, or politics." CP at 7007-08. Available information may include approximate price and audience size, expressed as a percentage or range. *Id.* Information is added to the library within 24 hours of an advertisement's first impression, updated regularly, and retained for 7 years. CP at 5910, 7305-06. Here, neither party disputes that much of the information required by Washington's disclosure law is included in Meta's Ad Library, but not all. CP at

5859-60. Required information that is *not* featured in the Ad Library includes the (1) street address of the individual sponsor that paid for the advertisement, (2) payment dates, payment method, and exact cost per advertisement, (3) audience targeted, and (4) number of impressions. CP at 7394-95; WAC 390-18-050.

ISSUES

1. Do the FCPA (former RCW 42.17A.345) and its implementing legislation (WAC 390-18-050) together violate the First Amendment to the U.S. Constitution?

2. Did the superior court err by calculating Meta's penalty based on each advertisement for which it failed to disclose the required information?

3. Did the superior court's civil penalty violate the Eighth Amendment to the U.S. Constitution?

ANALYSIS

*Standard of Review*

We review summary judgment decisions de novo. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is appropriate if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." CR 56(c). In determining whether

there is a "genuine issue as to any material fact," the court "must construe all facts and inferences in favor of the nonmoving party." *Ranger*, 164 Wn.2d at 552. "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Id*. "The moving party is entitled to summary judgment if it submits affidavits establishing it is entitled to judgment as a matter of law," unless the nonmoving party "'set[s] forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact.'" *Id*. (alteration in original) (quoting *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986)).

We review questions of law, including constitutional issues, de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). Questions of statutory interpretation are also reviewed de novo. *Tingey v. Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007); *State v. Valdiglesias LaValle*, 2 Wn.3d 310, 317, 535 P.3d 856 (2023). The court's goal in interpreting a statute is to "ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). The first step in statutory interpretation is to determine the statute's plain meaning, based on the text, context, related provisions, and the statute as a whole. *State v. Haggard*,

195 Wn.2d 544, 548, 461 P.3d 1159 (2020). If a statute "can be reasonably interpreted in more than one way," it is ambiguous, and the court may look to legislative history, case law, and statutory construction to determine legislative intent. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 354, 144 P.3d 276 (2006). "A statute is ambiguous only if it can be reasonably interpreted in more than one way, not merely because other possible interpretations exist." *Id.* (citing *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004) (plurality opinion)). "Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). [4]

1. The FCPA does not violate Meta's First Amendment right to free speech

The purpose of Washington's FCPA, which dates back to 1972, is to ensure that "political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided." Former RCW 42.17A.001(1) (2019). The FCPA also includes a command that "the provisions of this chapter shall be liberally construed to promote complete disclosure … [and]

---

[4] Civil penalties imposed by a trial court "within the statutory limits" are reviewed "for an abuse of discretion." *State v. Mandatory Poster Agency, Inc.*, 199 Wn. App. 506, 525, 398 P.3d 1271 (2017). Here, because Meta challenges only the superior court's interpretation of the statute, we review the issue de novo.

assure continuing public confidence of fairness of elections and governmental processes." Former RCW 42.17A.001(11). In 2011, the Washington State Legislature added an additional statement emphasizing the importance of full disclosure and transparency and declaring an intent to levy larger penalties against those who violate the law.

> The legislature finds that timely and full disclosure of election campaign funding and expenditures is essential to a well-functioning democracy in which Washington's voters can judge for themselves what is appropriate based on ideologies, programs, and policies. Long-term voter engagement and confidence depends on the public knowing who is funding the multiple and targeted messages distributed during election campaigns.
>
> The legislature also finds that recent events have revealed the need for refining certain elements of our state's election campaign finance laws that have proven inadequate in preventing efforts to hide information from voters. The legislature intends, therefore, to promote greater transparency for the public by enhancing penalties for violations; regulating the formation of, and contributions between, political committees; and reducing the expenditure thresholds for purposes of mandatory electronic filing and disclosure.

LAWS OF 2011, ch. 145, § 1.

In 2018, the Public Disclosure Commission (PDC), the regulatory body charged with enforcing the FCPA, enacted WAC 390-18-050. This provision requires "digital communication platforms" to maintain records of the political advertisements they host. The records must be updated within 24 hours of the advertisement's first distribution and maintained for 5 years, and must include,

among other things, a copy of the advertisement, the name of the candidate or ballot measure supported or opposed, the cost of the advertisement, and "a description of the major work components or tasks … that were required to provide the advertising." WAC 390-18-050(3), (6)-(7). Those "components or tasks" include

(i) A description of the demographic information;

(ii) The statistical characteristics of a population (e.g., age, gender, race, location, etc.), of the audiences targeted and reached, to the extent such information is collected by the commercial advertiser as part of its regular course of business;

(iii) The total number of impressions generated by the advertisement or communication; and

(iv) Any generative adversarial network techniques, artificial intelligence, or other digital technology, provided by the commercial advertiser to produce any 'synthetic media,' as defined under [former RCW 42.62.020 (2023)], for the advertisement or communication.

WAC 390-18-050(7)(g).

Regarding disclosure of the records, the 2018 updates further state:

Until such time as the PDC provides an open access platform on its website for this information, which will replace the following methods of inspection for all required information, such information must be available for public inspection by any person, and provided:

(a) In person during normal business hours; or

(b) Electronically, in machine readable format and structured in a way that enables the data to be fully discoverable and useable by the end user:

(i) By digital transmission, such as email, promptly upon request, but no later than two business days; or

(ii) By online publication in one of the following formats:

(A) On the advertiser's primary website; or

(B) On a website controlled by the advertiser, created for purposes of publishing the information required by this section, if a link is prominently displayed on the advertiser's primary website directing users to the website on which the information is provided.

WAC 390-18-050(4).

Prior to the 2018 additions, Meta was already subject to the FCPA under former RCW 42.17A.345(1), which requires that

> [e]ach commercial advertiser who has accepted or provided political advertising or electioneering communications during the election campaign shall maintain current books of account and related materials … that shall be open for public inspection during normal business hours during the campaign and for a period of no less than five years after the date of the applicable election.

Information required under this provision includes the names of parties who purchase political advertisements, plus the cost, manner of payment, and "the exact nature and extent of the services rendered." *Id*. Commercial advertisers must provide copies of the information to the PDC upon request. Former RCW 42.17A.345(2). Here, former RCW 42.17A.345 and its implementing legislation, WAC 390-18-050, do not violate Meta's First Amendment rights.

Campaign finance disclosure laws "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). However, they remain a "less

11

restrictive alternative to more comprehensive regulations of speech" that allow states to pursue important interests like informing voters, deterring corruption, and monitoring elections without banning speech outright. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 369, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010). Accordingly, the U.S. Supreme Court has consistently applied the less restrictive exacting scrutiny standard to campaign-related disclosure laws. Under exacting scrutiny, a disclosure law will be upheld if it is substantially related to a sufficiently important government interest and is narrowly tailored to serve that interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021).

The U.S. Supreme Court has repeatedly recognized the important role that disclosure laws play in informing voters about how money is spent to influence elections, finding that exacting scrutiny strikes the appropriate balance between upholding the First Amendment while pursuing the goal of election transparency. *Buckley*, 424 U.S. at 76 (upholding required disclosure of campaign contributions "to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible"); *Citizens United*, 558 U.S. at 371 (upholding disclosure requirements for campaign advertisements because "disclosure permits citizens and shareholders to react to the speech of

corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages"); *John Doe No. 1 v. Reed,* 561 U.S. 186, 192, 199, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (2010) (holding that public disclosure of referendum signatures "promotes transparency and accountability in the electoral process to an extent other measures cannot"); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 224, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014) (plurality opinion) ("With modern technology, disclosure now offers a particularly effective means of arming the voting public with information.").[5] We have also reiterated that "'exacting scrutiny applies in the campaign finance disclosure context.'" *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 799, 432 P.3d 805 (2019) (quoting *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 994 (9th Cir. 2010)); *see also State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 893, 502 P.3d 806 (2022) (*GMA*) ("to guard against infringing on these First Amendment rights, laws mandating disclosure 'must survive exacting scrutiny'" (internal quotation marks omitted) (quoting *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 482, 166 P.3d 1174 (2007))).

---

[5] The U.S. Supreme Court reiterated in 2021 that "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny," expanding application of exacting scrutiny beyond merely campaign finance laws. *Ams. for Prosperity*, 594 U.S. at 608.

Meta argues that because Washington's "content-based" disclosure law restricts *platforms* rather than candidates or lobbyists, it must satisfy strict scrutiny to be constitutional. Suppl. Br. of Pet'r at 8, 10; *see Reed v. Town of Gilbert*, 576 U.S. 155, 163-64, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). Meta essentially asks for an exception or a change to the exacting scrutiny rule specifically for advertising platforms. It claims that disclosure laws applied to platforms are more likely to suppress speech than disclosure laws aimed at political actors because political actors wish to "'succeed at the ballot box'" and are unlikely to curtail their speech in the face of disclosure laws, while economically motivated platforms will choose not to carry political advertising at all if disclosure obligations are too costly. Suppl. Br. of Pet'r at 10 (quoting *Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019)).

Neither the Washington nor the U.S. Supreme Courts have previously determined which standard of review should apply to a political advertising disclosure law directed at a social media platform. In *McConnell v. Federal Election Commission*, the U.S. Supreme Court applied exacting scrutiny to a disclosure law aimed at broadcasters. 540 U.S. 93, 237-38, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003) (*overruled in part on other grounds by Citizens United*, 558 U.S. 310). The *McConnell* Court upheld the law because the Federal Communications Commission

(FCC) needed the broadcasters' records to monitor compliance with the "fairness doctrine" and because the administrative burden was minimal.[6] *Id*. Even though *McConnell* predates and is not a perfect analogy for the modern Internet and broadcast digital platforms, *McConnell* shows that the rationale behind exacting scrutiny applies to nonpolitical entities as well as to political parties. The clear weight of precedent supports exacting scrutiny as the appropriate standard in this case.

The rationale behind exacting scrutiny has always been that disclosure laws are "a less restrictive alternative to flat bans on certain types or quantities of speech," allowing the government to pursue the important goal of informing voters without banning anyone from speaking. *McCutcheon*, 572 U.S. at 223. The courts do not have a history of carving out exceptions based on the type of actor sharing the speech, and voters benefit just as much from disclosure laws applied to platforms as they do from disclosure laws applied to candidates. This is true even when an entity voluntarily adjusts its business decisions to account for any costs associated with compliance. The disclosure law may impact Meta's motivation to host political speech, but it does not prevent Meta from hosting the political speech, and Meta's business decisions should not dictate the appropriate standard of review. Even if

---

[6] The "fairness doctrine" was an FCC rule that required broadcasters to offer a reasonable opportunity for speakers to present opposing viewpoints. The doctrine was abolished. 74 AM. JUR. 2D *Telecommunications* § 113 (2026).

Meta chooses to curtail advertising opportunities, claims of market deterrence do not negate the underlying rationale behind exacting scrutiny. Therefore, exacting scrutiny is the correct standard for assessing the constitutionality of disclosure laws, including the FCPA.

The concurrence/dissent argues that deferential scrutiny, not exacting scrutiny, is the applicable standard of scrutiny here because Meta's transactions with advertisement purchasers are commercial speech. Concurrence/dissent at 10-11. However, "[i]n reviewing the trial court's decision, we confine ourselves to the issues the parties have raised and which the trial court considered." *Babcock v. State*, 116 Wn.2d 596, 606, 809 P.2d 143 (1991). "We may not speculate upon the existence of facts that do not appear in the record." *State v. Blight*, 89 Wn.2d 38, 46, 569 P.2d 1129 (1977). Neither Meta nor the State discussed deferential scrutiny in their briefs or at oral argument. Therefore, we will not address whether deferential scrutiny is appropriate in this case.

In addition, the FCPA satisfies exacting scrutiny as it requires "'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *John Doe No. 1*, 561 U.S. at 196 (internal quotation marks omitted) (quoting *Citizens United*, 558 U.S. at 366-67). Furthermore, the disclosure

requirement is "narrowly tailored to the government's asserted interest." *Ams. for Prosperity*, 594 U.S. at 608.

Meta suggests "the State has failed to establish that less speech-suppressive alternatives would not work to advance its stated interest," and therefore the law must fail exacting scrutiny.[7] Suppl. Br. of Pet'r at 20. This misrepresents *Americans for Prosperity*, which specifically states that the law need *not* "be the least restrictive means of achieving [the government's] ends." 594 U.S. at 608. While it is possible to identify alternative measures Washington could take to inform voters without inconveniencing Meta, that alone is insufficient to find that the law fails exacting scrutiny.

Furthermore, none of those alternative options are sufficient to provide full transparency as contemplated by the FCPA. Former RCW 42.17A.001. For example, Meta argues that Washington could limit disclosure obligations to certain periods of time, such as 21 days before the election. Suppl. Br. of Pet'r at 21. However, this will limit the scope of information voters have access to, especially given how long campaigns can run. Meta also argues that Washington could require Meta to disclose information only on those advertisements the purchaser self-identifies as political.

---

[7] Meta claims that other states have enacted "considerably less intrusive disclosure" laws that shift the burden from platforms to advertisers by requiring purchasers to identify an advertisement as political before the platform is required to disclose it. Pet'r's Answer to Amicus Curiae Brs. at 14-29.

*Id.* However, while it is not clear how many advertisements are mislabeled by the purchaser, there is certainly the potential for mislabeled advertisements to go unreported, thus limiting again the scope of information voters have access to. Meta also argues that Washington could require that Meta disclose information only to the State upon request, rather than allowing for individual requests from the public. Pet'r's Answer to Amicus Curiae Brs. at 21-23. However, the FCPA is intended most of all to protect Washington voters, and the legislature deemed it necessary to allow the public direct access to Meta's data to achieve full transparency. Finally, *amicus* argues that the State could merely require Meta to label advertisements on their platforms as "political" to signal to users that they are viewing political content. Br. of Amicus Curiae Digit. Advert. All. at 32-37. However, this approach will provide almost no information because the label "political" will not necessarily tell users where the advertisement came from or why they were targeted by it.

No alternative option provides voters with the same scope of information as the disclosure law. The legislature reasonably concluded that the law as is best serves the FCPA's goal of transparency. As the State explains, "Our federalist system of government contemplates differences between states' laws," and the fact that other states have taken different approaches "does not make Washington's law 'dubious,' nor is there anything suspect about the overriding importance Washington voters

placed on transparency when they adopted the FCPA." Resp't's Answer to Amici Curiae Brs. at 10. Washington's disclosure law is both substantially related to an important government interest and narrowly tailored to serve that interest. Therefore, it satisfies exacting scrutiny.

The "vital provision of information repeatedly has been recognized as a sufficiently important, if not compelling, governmental interest." *Hum. Life*, 624 F.3d at 1005-06. The State describes its "important governmental interest" as "achieving election integrity and transparency by requiring timely and detailed information disclosures about political ads, facilitating an informed electorate." Suppl. Br. of Resp't at 13-14. Meta does not dispute that this is an important state interest, but it does challenge both the substantial relationship and narrow tailoring prongs of the exacting scrutiny analysis. Suppl. Br. of Pet'r at 13-14.

The State argues that the disclosure law is substantially related to voter education because "[i]nformation about sponsorship, targeting, and reach inform voters about an ad's intent, meaning, and impact, including if the ad intends to mobilize or demobilize through tactics like fear mongering or misinformation." Suppl. Br. of Resp't at 14; *see also* CP at 6344-59. According to one expert, the public can properly evaluate the meaning and impact of a political advertisement only by knowing who paid for it, what its content is, and who it targets. CP at 6348.

Another expert explained that people may view a political advertisement differently if they knew why it was targeted at them and that knowing how an advertisement is targeted can make it easier to detect misinformation. CP at 6423, 6426. The State also established that only Meta has access to all pertinent information related to their use of microtargeted advertising services. CP at 6364-65. The State has shown that the FCPA is substantially related to the State's interest in achieving election transparency and fostering an informed electorate.

To satisfy the final step of an exacting scrutiny analysis, the disclosure law must "be narrowly tailored to the government's asserted interest." *Ams. for Prosperity*, 594 U.S. at 608. Here, the FCPA is narrowly tailored because only Meta can provide all relevant information related to political advertising on its platforms. Meta makes four primary arguments as to why the disclosure law is so overly burdensome as to fail exacting scrutiny. Suppl. Br. of Pet'r at 12-22. First, the State can, and in some cases already does, obtain the desired information from other parties. *Id*. at 14. Second, Meta received only a few disclosure requests from members of the public. *Id*. at 7, 18. Third, the law disincentivizes platforms from hosting political advertisements, which leads to the sharing of *less* political information. *Id*. at 10, 15-17. Fourth, the State has not shown it is technically

feasible for Meta to comply with the disclosure law. *Id*. at 18-19. Meta's arguments are unpersuasive.

First, Meta argues the FCPA requirement results in redundant disclosure. It may be true that much, though not all, of the information Meta is required to disclose must also be disclosed by the campaigns or groups that purchase political advertisements. *Meta*, 33 Wn. App. 2d at 162. However, as one expert explained, the platforms have information the purchasers do not, including demographic information, so applying the disclosure law to Meta yields information not otherwise available to the public. CP at 6366-68; *see also* Resp't's Answer to Amici Curiae Brs. at 29-30 ("When a particularly impactful or controversial political ad is observed, the FCPA's recordkeeping requirements for commercial advertisers allow the public and media to rapidly access detailed information about that ad from where it was seen or heard rather than having to wait until the next reporting deadline and a potential report that will include only the information available to the sponsor."). Despite two years of discovery, Meta has not offered sufficient evidence to show that advertisers alone could provide the same information required of Meta. In addition, the State is allowed to require both parties to a transaction to disclose overlapping information, even if other parties could disclose the same data. In fact,

this further promotes transparency because it gives the public a means of fact-checking.

Second, Meta highlights that in this case, three individuals made a total of 12 requests for political advertising information. CP at 256-64. Meta asserts that two of the individuals made the requests solely to test Meta's compliance and that a third made requests to support a consulting business. Suppl. Br. of Pet'r at 7; CP at 38-50, 5241, 7580-82. Meta argues that this type and level of use shows that the law is not substantially related to the goal of informing voters. However, this argument is unconvincing, given that journalists and academics may disseminate information widely even if they submit only one request. *Meta*, 33 Wn. App. 2d at 162.

Third, suggesting it would be "financially irrational" to host political advertisements while the disclosure law is in place, Meta banned political advertisements in Washington in 2018.[8] Pet. for Rev. at 2; CP at 615-16. Meta characterizes its decision as evidence that the law subverts, rather than serves, the State's interest in increasing access to political information. Suppl. Br. of Pet'r at 15-16; *see also* Pet'r's Answer to Amicus Curiae Brs. at 8-9 ("Meta and other major platforms had no realistic choice but to ban Washington political advertising on their services."). Candidates, particularly those with fewer resources, may be impacted by

---

[8] Despite the ban, political advertisements have continued to run on Meta platforms in Washington since 2018. CP at 7328, 7335, 7372.

Meta's ban because they rely on its low-cost targeted advertising. [9] CP at 5329-78, 7115-16, 7410-19; *see also* Br. of Amicus Curiae Inst. for Free Speech at 11-15.

Meta repeatedly cites *Washington Post*, in which the Fourth Circuit Court of Appeals struck down a Maryland law that required platforms, including newspapers, to disclose the purchaser and price of political advertisements displayed on their websites.[10] 944 F.3d at 514; Suppl. Br. of Pet'r at 20. The Fourth Circuit based their holding in part on their conclusion that Maryland's law discouraged online newspapers from selling political advertising space. *Wash. Post*, 944 F.3d at 515. However, the *Washington Post* court expressly limited their holding to news outlets and did not wish to "expound upon the wide world of social media and all the issues that may be pertinent thereto." *Id*. at 513.

The State counters that "Meta chose not to comply with the FCPA because it was inconsistent with its own stated priorities—not because the law is overly burdensome." Suppl. Br. of Resp't at 19; *see also* Resp't's Answer to Amici Curiae Brs. at 37. The superior court agreed, concluding that "'the only reason why Meta refuses to comply with the law is, to put it colloquially, they don't want to let the

---

[9] Meta argued at the Court of Appeals that the law overly burdens both its own speech and the speech of its users. The Court of Appeals correctly rejected its argument as to third parties for lack of standing.

[10] The *Washington Post* court declined to determine whether strict scrutiny or exacting scrutiny should apply, instead concluding that the Maryland law failed to satisfy even exacting scrutiny. 944 F.3d at 520.

public see how the sausage is made.'" *Meta*, 33 Wn. App. 2d at 174 (quoting CP at 5630).

Meta's ban on advertising is self-imposed and does not impact this court's exacting scrutiny analysis. Enforcing disclosure requirements is an essential tool the State has available to educate and keep the public informed about how billions of dollars are spent to influence their votes. The State cannot account for internal corporate decisions. Therefore, some platforms may choose to reject political advertisements because they decide it is not in their interest to comply with the requirements of the FCPA. Meta's argument that the disclosure law reduces the amount of political speech available to the public misconstrues the purpose of the disclosure law, which is to facilitate election transparency, not to ensure a proliferation of political advertisements. FCPA is a disclosure requirement, and "disclosure requirements may burden the ability to speak, but they … 'do not prevent anyone from speaking.'" *Citizens United*, 558 U.S. at 366 (quoting *McConnell*, 540 U.S. at 201). Here Meta, not the State, chose to foreclose advertising opportunities for candidates.

Finally, whether to consider compliance costs as applied to this type of platform and, if we do so, how it is to be applied are issues of first impression for us. Meta does not dispute that it already collects the required information in its

regular course of business yet claims that complying with the disclosure law is overly and technically burdensome. [11] CP at 5861-62; *see also* CP 7167-74; Suppl. Br. of Pet'r at 18.   Since *McConnell*, cases assessing ongoing costs associated with disclosure requirements in the FCPA context are few and technology has changed significantly. 540 U.S. 93. In *McConnell,* a broadcaster claimed that election-related recordkeeping and inspection requirements imposed a serious burden, but the Court rejected their argument because compliance required only about "six to seven hours of work per year" at the whole organization, a minor inconvenience. 540 U.S. at 235.

Here, the State's expert estimated that including a Washington-specific region in Meta's Ad Library would cost around $200,000, an overall "very inexpensive route" that would be "comfortably within Meta's capabilities."[12] CP at 6501, 6498, 6495. In response, Meta's expert witness stated in his report that "complying with the Washington Disclosure Law is not as simple or straightforward" as the State's experts alleged, explaining that it would be challenging for Meta to identify every political advertisement and would require ongoing human review. CP at 7859; *see also* Br. of NetChoice et al. as Amici Curiae in Supp. of Pet'r at 18-23. Additionally,

---

[11] Meta also argues that whether compliance is feasible or not is irrelevant because the burden is still disproportionate, citing *Americans for Prosperity*. That case, however, turned on the burden imposed on the associational and privacy rights of charitable donors. It does not speak to the issue of technical burdens. Suppl. Br. of Pet'r at 12-13; *Ams. for Prosperity*, 594 U.S. at 607.

[12] Meta is not required to comply with the law via its Ad Library, but this expert testified that modifying the Ad Library is the most cost-effective option. WAC 390-18-050(4); CP at 6495, 6501.

updating the Ad Library would require "substantial changes to its carefully designed transparency tools" and responding to individual requests would be a "complex and burdensome process." CP at 7859, 7870-75, 7880-89; *see also* CP at 7007. However, Meta has created region-specific disclosure programs for other countries in its Ad Library. CP at 5933-36, 6289-91.

The superior court found that "Meta failed to provide evidence to create a genuine issue of material fact regarding its inability to comply, whereas the State presented sufficient evidence explaining both how and why Meta could comply." CP at 5575. The Court of Appeals agreed, finding that "[a]fter years of discovery, we know nothing more about the burden on Meta than high level, even 'speculative,' generalities that lack the 'specificity' to create a genuine issue of material fact." *Meta*, 33 Wn. App. 2d at 173-74. We also agree.

The dissent finds that Meta's general statements about the difficulties of compliance are sufficient to create a genuine issue of material fact, dissent at 22, but to overcome summary judgment, it is for Meta to "set forth *specific* facts which sufficiently rebut" the State's claims. *Meyer*, 105 Wn.2d at 852 (emphasis added). Meta has failed to do so. After more than two years of discovery, Meta has failed to provide specific details about what compliance with Washington's FCPA would actually cost, and its expert did not attempt to quantify the resources needed to

comply, instead stating that some elements of the burden "probably are not subject to very precise quantification." CP at 7026-27, 7033-54. In addition, at oral argument Meta conceded that it can comply with the law but finds it burdensome to do so and continued to provide only generalized statements about the burden. Wash. Sup. Ct. oral arg., *State v. Meta Platforms, Inc.*, No. 103748-1 (Oct. 28, 2025), at 9 min., 06 sec.; 11 min., 57 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2025101109/. Meta's ability to comply with our FCPA and its claimed burdens and costs associated with compliance are vague and inconclusive only because Meta failed to provide necessary information that would allow our courts to meaningfully evaluate its claimed burden. Under the facts of this case, there is no genuine issue of material fact. Meta concedes that it can comply with the FCPA. Any issues of material facts regarding its burden are totally within Meta's control and exist because of Meta's refusal to clarify the details of that burden. Meta has complied with similar laws in other jurisdictions yet has failed to disclose requested information required by the FCPA. CP at 5861-62. Washington's FCPA disclosure requirement is narrowly tailored, and Meta has failed to prove that it is unduly burdensome. Accordingly, the disclosure law satisfies exacting scrutiny.

2. The superior court's per-advertisement penalty correctly upholds the FCPA's goal of full transparency

"A person who violates any of the provisions of [the FCPA] may be subject to a civil penalty of not more than ten thousand dollars for each violation." Former RCW 42.17A.750(1)(c).[13] The FCPA defines a "violation" in the negative, as anything other than a "remediable violation, minor violation, or an error classified by the commission as appropriate to address by a technical correction." Former RCW 42.17A.005(54) (2025). There is no dispute that Meta committed general violations of WAC 390-18-050.

The superior court imposed the maximum penalty of $10,000 per violation, granted attorney fees and costs, and trebled all damages.[14] CP at 5791-93, 5814-17. It counted each advertisement included in a request as a separate violation. *Id*. To reach the total number of 822 advertisements, the court counted advertisements requested by the first two individuals, a total of 411, then doubled that number to account for the third individual's broad request.[15] CP at 5574, 5791-93. The total

---

[13] The FCPA lists 14 factors the court may consider in assessing a civil penalty, including "the respondent's compliance history," the organization's or individual's experience with campaign finance law and their available resources, the impact on the public, whether they "benefited politically or economically from noncompliance," and "[g]ood faith efforts to comply." Former RCW 42.17A.750(1)(d).

[14] The FCPA authorizes the award of "all reasonable costs of investigation and trial, including reasonable attorneys' fees" and treble damages (of both the penalty and the attorney fees) if the violation is intentional. Former RCW 42.17A.780.

[15] The third requester sought information on "'every political ad shown in Washington State since 2016,'" which included at least 1,600 advertisements, including every advertisement sought in the earlier two requests. CP at 5574.

penalty is $35,182,159.59, including $24,660,000.00 in civil penalties and $10,522,159.59 in costs. CP at 5791-93, 5814-17.[16]

The FCPA is intended to be "liberally construed" to allow for maximum disclosure, and a per-advertisement calculation is best aligned with that objective. Former RCW 42.17A.001; *see also* former RCW 42.17A.904 (1973). Meta argues that the superior court should have assessed a penalty for each request it failed to adequately respond to (12) rather than for each advertisement included in those requests (822). Suppl. Br. of Pet'r at 22-23. It argues that "[a] platform satisfies its obligations under the disclosure law by making information available 'promptly *upon request*.'" *Id*. at 23 (quoting WAC 390-18-350(4)(b)(i)). Therefore, in Meta's view, the only violation it can be penalized for is the failure to respond to a request. The State argued, and the Court of Appeals agreed, that Meta, as a commercial advertiser, is required under former RCW 42.17A.345(1)-(2) to "'maintain *current* books of account and related material[]' that shall remain 'open' for public inspection" during normal business hours. Resp't's Suppl. Br. at 23. As a result, each

---

The superior court calculated the number of advertisements in the scope of the third request by adding together the number of advertisements sought in the two earlier requests.

[16] At the summary judgment hearing, the judge stated that "enforcement penalties and so on – have to be limited to the requests ... [w]hen somebody makes a request and they don't produce it, then they're not complying with the law. But before … I don't think that's something I can enforce against them with – absent somebody making a request." *Meta*, 33 Wn. App. 2d at 195 (alterations in original) (quoting CP at 5526-27). In its final written order, the superior court calculated Meta's penalty on a per-advertisement basis. CP at 5575, 5587. Because its ultimate conclusion was correct, the superior court's initial thoughts on the matter are irrelevant.

advertisement for which Meta fails to provide the required information is a separate violation.[17]

We find the superior court's calculation of damages based on the number of advertisements where Meta failed to disclose the required information is correct and best supports the legislative intent. The legislature intends maximum disclosure, and to support this position every advertisement is subject to the disclosure requirements. Former RCW 42.17A.001.

Former RCW 42.17A.750 discusses penalties imposed on those who fail to file reports "as required by this chapter," referring to FCPA provisions requiring candidates, political committees, and lobbyists to file automatic disclosure reports. Former RCW 42.17A.345. "A person who violates any of the provisions of this chapter may be subject to a civil penalty of not more than ten thousand dollars for each violation." Former RCW 42.17A.750(1)(c). The listed entities clearly commit a "violation" when they fail to file an accurate report. However, platforms like Meta are not obligated to file regular reports. Therefore, the moment at which they commit

---

[17] Meta cites a nonpublic document created by the PDC stating that "[b]asing the number of violations solely upon the number of ads referenced in a request could quickly lead to a penalty amount grossly disproportionate to other violations of RCW 42.17A." CP at 8011. The Court of Appeals dismissed the document as "hardly convincing" and correctly pointed out that under a de novo review, they are not required to interpret the law in accordance with unofficial commentary. *Meta*, 33 Wn. App. 2d at 199-200. We are also under no obligation to do so and do not find this document, which represents the opinion of one PDC staffer, persuasive.

a "violation" is less clear.[18] To comply with the FCPA, Meta is required to do three things. First, Meta must "maintain current books of account and related materials as provided by rule that shall be open for public inspection during normal business hours during the campaign and for a period of no less than five years after the date of the applicable election." Former RCW 42.17A.345(1). Second, "[a]t the request of the commission," Meta "shall provide to the commission copies of the information that must be maintained and be open for public inspection." Former RCW 42.17A.345(2). Third, Meta is required to disclose additional information in the following manner:

> (4) Until such time as the PDC provides an open access platform on its website for this information, which will replace the following methods of inspection for all required information, such information must be available for public inspection by any person, and provided:
>
> (a) In person during normal business hours; or
>
> (b) Electronically, in machine readable format and structured in a way that enables the data to be fully discoverable and useable by the end user:
>
> (i) By digital transmission, such as email, promptly upon request, but no later than two business days; or
>
> (ii) By online publication in one of the following formats:

---

[18] Both parties cite *Bittner v. United States* in which the U.S. Supreme Court decided whether a person who has failed to file annual disclosure statements about their foreign bank accounts may be assessed a $10,000 penalty per faulty annual *report* or per each *account* they failed to disclose. 598 U.S. 85, 89, 143 S. Ct. 713, 215 L. Ed. 2d 1 (2023). There, because each individual had the obligation to file only one annual report regardless of how many foreign bank accounts they had, the court favored the per-report reading. *Id*. Similarly, in *GMA*, this court considered penalties for political actors who were obligated to file automatic reports. 198 Wn.2d at 894. Neither case is analogous here because both scenarios involved regular required reports.

(A) On the advertiser's primary website; or

(B) On a website controlled by the advertiser, created for purposes of publishing the information required by this section, if a link is prominently displayed on the advertiser's primary website directing users to the website on which the information is provided.

WAC 390-18-050. This third provision gives Meta four disclosure options, including but not limited to providing information "promptly upon request." WAC 390-18-050(4)(b)(i).

The FCPA contains a "Declaration of Policy." The legislature's purpose in enacting the law is "[t]hat political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided." Former RCW 42.17A.001(1). The law "shall be liberally construed" to promote its goals. Former RCW 42.17A.001(11); *see also* former RCW 42.17A.904. In sum, the Court of Appeals concluded, this language demonstrates an "intent to preserve and sunlight relevant data of each individual ad on Meta's social media platforms, without any requirement that any particular voter or the government step into the sunlight to inspect the records." *Meta*, 33 Wn. App. 2d at 197. Additional language in the statute reaffirms "that timely and full disclosure of election campaign funding and expenditures is essential to a well-functioning democracy" and that the legislature "intends, therefore, to promote greater transparency for the public by *enhancing* penalties for violations." LAWS OF 2011, ch. 145, § 1 (emphasis added).

We agree that the disclosure law, taken as a whole, shows that the legislature intended that Meta be held accountable for each advertisement it fails to disclose to the public when a request is made.

Meta is correct that this procedure means the State will have no opportunity to assess a penalty until a request is made. However, under Meta's interpretation, the failure to disclose information related to 1 advertisement in response to one request will receive the same penalty as the failure to disclose information related to 100 advertisements sought in one request. Resp't's Suppl. Br. at 25-26. This interpretation is unpersuasive because each advertisement that is not disclosed deprives voters of relevant information about how and by whom campaign finance dollars are spent.

The disclosure law clearly and repeatedly promotes maximum disclosure of campaign finance information. It creates a right of "public inspection by any person," WAC 390-18-050(4), and it seeks to ensure that information is "fully disclosed to the public." Former RCW 42.17A.001(1). The Court of Appeals aptly explained:

> [O]ur courts, in a variety of different but related settings, have reiterated the Washington's campaign finance laws' intent to ensure full disclosure of individual records. … These statements of intent do not rely on the voter prompting or availing themselves of such transparency.

*Meta*, 33 Wn. App. 2d at 198. Consequently, each advertisement that is *required* to be disclosed but is not should be considered a separate violation. This interpretation best supports the legislature's intent to promote maximum disclosure of all election finance information that contributes to voter education. It also aligns with the legislature's intent to enhance public penalties to promote greater transparency.[19] Furthermore, the statute permits *up to* $10,000 in penalties per violation, but the trial judge has considerable discretion in determining a penalty and is authorized to consider multiple factors, such as a history of compliance, available resources, and good faith efforts. Former RCW 42.17A.750(c), (d). Here, the court faced a willful repeat offender with vast resources that conceded it is able to comply with FCPA requests but chose not to provide nonspeculative reasons for its decision not to do so. The trial court's decision to impose the maximum penalty was appropriate, but just because hundreds of advertisements may be included in a request does not mean a penalty will always lead to a "grossly disproportionate" penalty. It is one of many factors the court considers as the court here did.

---

[19] Meta asks this court to apply the rule of lenity because the meaning of "violation" is ambiguous. Suppl. Br. of Pet'r at 28-29. We do not find the meaning of "violation" ambiguous. Therefore, the rule of lenity is not appropriate here.

3. The superior court's penalty does not violate the Eighth Amendment prohibition against excessive fines

The Eighth Amendment prohibits "cruel and unusual punishments," which includes a prohibition against "excessive fines." U.S. CONST. amend. VIII, *see also* WASH. CONST. art. I, § 14.[20] Fines are excessive if they are "grossly disproportional to the gravity of a defendant's offense," as determined by "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998); *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004); *see also City of Seattle v. Long*, 198 Wn.2d 136, 173, 493 P.3d 94 (2021). For the purposes of this analysis, we assume without deciding that the Eighth Amendment's prohibition against "excessive fines" protects corporate entities such as Meta.

The penalty assessed to Meta here is not excessive as it is not "grossly disproportional" to the gravity of Meta's offense. First, Meta is a sophisticated, well-resourced platform that willfully violated the FCPA after previously being held

---

[20] The Court of Appeals declined to consider Meta's federal Eighth Amendment argument because Meta did not address it in detail in its brief. *Meta*, 33 Wn. App. 2d at 207 n.37 (reasoning that "'[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration'" (quoting *Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996))).

accountable for prior noncompliance. CP at 5859, 5861-62, 5956-60. Meta has not shown a good-faith effort to comply with the disclosure law, even though after two years of discovery it admits it has the capability to comply, and the court received information that Meta has updated its Ad Library to meet requirements of other jurisdictions. CP at 6289-91. Meta is being penalized for willfully violating the disclosure law at least 822 times, not for "abstract concerns about election integrity," as the dissent claims. Dissent at 41. The "nature and extent" of Meta's violations are significant. *Bajakajian*, 524 U.S. at 334. Meta finally disclosing *some* of the required information does not change the fact that it intentionally withheld information the requesters were entitled to receive.

In *GMA*, this court upheld an $18 million penalty against a trade group that failed to file required disclosure reports and funneled $11 million through a "strategic account" with the purpose of sheltering political donors from disclosure requirements. 198 Wn.2d at 894. The dissent distinguishes this case from *GMA* by giving Meta credit for disclosing at least the purchaser and cost of advertisements via its Ad Library. Dissent at 43. However, Meta's disclosure of the cost and the identity of the purchaser does not necessarily decrease the severity of the infraction. The disclosure law seeks to shed light on the *methods* Meta uses to disseminate political advertisements, specifically through microtargeting, and Meta's limited

disclosure fails to meet the related requirements that serve that purpose under the disclosure law. Meta's failure to disclose the purchasers' identities might have made the infraction *worse*, but the fact that Meta did disclose some information does not mean the penalty must be reduced. The dissent indicates that *GMA*'s violations were more severe than Meta's, but even taking that assertion as true, *GMA* does not set a ceiling on appropriate penalties. Dissent at 44. Meta's actions show a willful and repeated disregard for the disclosure law, and the nature and extent of its violations justify the penalty.

The second and third *Bajakajian* factors are not relevant here as neither side argues that Meta's activities relate to other legal violations or that other penalties (save for an injunction) may be imposed.[21]

Meta argues that the fourth *Bajakajian* factor, the "extent of the harm," is limited only to the three individuals whose requests went unfulfilled. Suppl. Br. of Pet'r at 30-31. In *GMA*, this court emphasized the importance our disclosure law places on transparency and how the trade group's conduct directly flouted that purpose. The *GMA* reasoning is applicable here. Meta did not outright hide the identity of political contributors, but its repeated failures to disclose required

---

[21] The dissent argues that "[t]he fact that Meta's activities do not relate to other violations actually weighs in favor of Meta here." Dissent at 45. We disagree. Meta's violations of the disclosure law here alone provide a sufficient basis on which to impose a penalty whether it is part of a "larger plot" to "undermine election transparency" or not. *Id*. Meta should not get credit for not participating in additional illegal activities.

information similarly defy the FCPA's strong goal of promoting transparency. Reducing the penalty would undercut the disclosure law's clearly worded intent to enhance penalties for violators. Plus, the disclosure law is written in such a way that it allows any member of the public to request information from Meta and do with it what they wish, including publishing and disseminating that information widely. Meta's failure to disclose the required information thus constructively denies all members of the public the opportunity to access information the legislature has deemed important to the law's purpose. In our view, that harm is extensive.

Finally, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336. The legislature here authorized a $10,000 maximum per violation and the trebling of all damages, and the superior court within its discretion sustainably imposed the penalty. Accordingly, the amount of the penalty did not violate Meta's federal Eighth Amendment rights.

CONCLUSION

We affirm the Court of Appeals.

_____
Whitener, J.

WE CONCUR.

_____
Stephens, C.J.

_____                    _____

_____                    _____

_____                    _____

No. 103748-1

MUNGIA, J. (concurring in part, dissenting in part)—I concur and I dissent.

I concur with the lead opinion that there is no First Amendment violation here. U.S. CONST. amend. I.  However, the lead opinion imposes a stricter level of scrutiny for the State's regulation than is allowed by the United States Constitution.  Precedent requires that we review this statute using a deferential, not exacting, level of scrutiny.

I dissent from the lead opinion's conclusion as to what constitutes "each violation" under the statute.  "Each violation" is not what Meta Platforms Inc. asserts: that "each violation" is limited to each request for information, regardless of the number of advertisements covered by that request.  Nor is "each violation" calculated as the lead opinion says: by compounding per-advertisement violations by the number of requests for the same information.[1]  Instead, the statute imposes a penalty for Meta not making certain information available about each advertisement.  Accordingly, the violation is limited to just that: each advertisement with undisclosed information.

---

[1] This was the trial court's calculation as well.

Accordingly, I would uphold the trial court's ruling that Meta's First Amendment rights were not violated but would reverse as to the amount of the penalty.

I

THE FAIR CAMPAIGN PRACTICES ACT REQUIRED META TO KEEP AND MAKE AVAILABLE TO THE PUBLIC FACTS ABOUT POLITICAL ADVERTISEMENTS HOSTED ON ITS PLATFORM

The Fair Campaign Practices Act (FCPA) required Meta to keep and make available to the public certain facts about each political advertisement it hosted on its platform. Former RCW 42.17A.345 (2019);[2] *see also* WAC 390-18-050. Meta complied with most of the requirements by posting the required information on its "Ad Library." Clerk's Papers at 5573. The use of the Ad Library allowed Meta to comply with the statute without requiring people who wanted that information to make individual requests. Likewise, Meta would not need to respond to individual requests. However, Meta failed to include the following required information in its Ad Library:

- The street address of the individual sponsor that paid for the advertisement;

- The payment dates, payment methods, and exact cost per advertisement;

- The targeted audience; and

- The number of impressions per advertisement.

From 2019 to 2021, three individuals requested information about political advertisements that Meta displayed in Washington State: Eli Sanders (two separate requests), Tallman Trask (one request), and Zach Wurtz (nine separate requests).

---

[2] Former chapter 42.17A RCW (2024) has since been recodified as Title 29B RCW, effective January 1, 2026. LAWS OF 2024, ch. 164, §103. Former chapter 42.17A RCW will be referenced throughout as it applied to Meta at the time of the action.

The trial court found that

- 254 separate 2019 advertisements displayed by Meta were responsive to the 2019 Sanders and Trask requests.

- At least 157 separate advertisements displayed by Meta were responsive to Sanders' 2021 request.

- At least 411 advertisements were responsive to Wurtz's July 2021 requests, which it found by counting all the same advertisements that were covered by the other requests.

The trial court found a violation for each advertisement where Meta did not provide the required information, calculating 411 separate advertisements with undisclosed information. In addition, the trial court found a violation occurred each time a person asked for the required information about a particular advertisement. The trial court then double counted the same 411 advertisements that went undisclosed between the separate requests, concluding there was a total of 822 violations. The trial court fined Meta $10,000.00 for each violation and, as allowed by statute, trebled the fines. Accordingly, the court imposed a civil penalty of $24,660,000.00 and entered an additional $10,522,159.59 in attorney fees and costs.

*State v. Meta*, No. 103748-1
(Mungia, J., concurring in part, dissenting in part)


II

THE FCPA'S DISCLOSURE REQUIREMENTS REGULATE COMMERCIAL SPEECH THAT DOES
NOT INVOLVE ASSOCIATIONAL RIGHTS. ACCORDINGLY, THIS COURT SHOULD REVIEW
THE STATUTE USING DEFERENTIAL, NOT EXACTING, SCRUTINY

We review constitutional questions de novo. *State v. Grocery Mfrs. Ass'n*, 195

Wn.2d 442, 456, 461 P.3d 334 (2020). At issue is whether the disclosure requirements

violate Meta's First Amendment rights.[3] The First Amendment to the United States

Constitution protects freedom of speech and freedom of assembly. *Ams. for Prosperity*

*Found. v. Bonta*, 594 U.S. 595, 605, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021). The

protections for speech apply to noncommercial and commercial speech. *Chong Yim v.*

*City of Seattle*, 194 Wn.2d 651, 677, 451 P.3d 675 (2019). However, the First

Amendment provides less protection to commercial speech than it does to

noncommercial speech. *Id.* at 677-78. This dispute involves the State's regulation of

commercial speech.

When reviewing governmental regulation of speech, courts apply varying

standards of review ranging from strict to deferential depending on the type of speech

involved. Generally, regulations that burden content-based speech, like restrictions on

---

[3] Appellate courts retain wide discretion in determining which issues must be addressed to
properly decide a case on appeal. *Clark County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 177
Wn.2d 136, 146, 298 P.3d 704 (2013). Appellate courts may consider and apply constitutional
mandates or established precedent not raised by the parties when necessary for a decision. *Id.*
Here, the parties raised the issue of the proper standard of review for this First Amendment
challenge. While the parties did not argue deferential review should apply, courts must apply the
law correctly even if the parties failed to present a proper view. *See Hall v. Am Nat'l Plastics,*
*Inc.*, 73 Wn.2d 203, 205, 437 P.2d 693 (1968) (noting that "[c]ourts frequently decide crucial
issues which the parties themselves fail to present"). Determining the proper level of scrutiny for
this challenge is essential to resolving the First Amendment issue before the court.

political speech, are subject to strict scrutiny. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010). However, when the government compels the disclosure of facts, a lower standard of review applies. As the lead opinion notes, we have not, nor has the United States Supreme Court, determined which standard of review should be used when reviewing the government's regulation of political advertisements on social media platforms. Lead opinion at 14.

A.  Exacting Scrutiny Applies When Reviewing Disclosure Requirements That Burden Associational Rights

When a government regulation requires the disclosure of facts that may also burden associational rights, then courts review those regulations under an exacting scrutiny standard. *Ams. for Prosperity*, 594 U.S. at 616 ("Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure." (quoting *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958))). While these types of regulations burden speech, they are subject to a less-than-strict scrutiny because they "'do not prevent anyone from speaking'" and "'impose no ceiling'" on associational activities. *Citizens United*, 558 U.S. at 366 (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 201, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. 310); *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). However, exacting scrutiny is still a heightened standard of review. A regulation survives exacting

scrutiny if the government shows it is substantially related to a sufficiently important government interest. *Id.* at 366-67.

There are numerous examples of courts applying exacting scrutiny to election-related disclosure and disclaimer requirements that burden associational rights. *See, e.g.*, *Buckley*, 424 U.S. at 63-64 (law requiring political committees and candidates to keep detailed records and make reports providing personal identifying information of their campaign contributors, subject to public inspection and copying); *Citizens United*, 558 U.S. at 366-71 (law requiring those funding televised electioneering communications to include a clear disclaimer of who is responsible for the content, and also requiring them to file disclosure statements with the Federal Election Committee identifying who made the expenditures and to which election the communication was directed); *Doe v. Reed*, 561 U.S. 186, 196, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (2010) (Washington law compelling disclosure of signatory information on referendum petitions); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) (Washington law requiring an entity to disclose information about its sponsorship of political advertisements and make certain reports); *Grocery Mfrs. Ass'n*, 195 Wn.2d at 461 (Washington law requiring a trade association requiring it to disclose who made contributions to it); *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 798-99, 432 P.3d 805 (2019) (campaign finance disclosure requirement imposed on entities providing pro bono legal services to support election efforts). These cases highlight that exacting scrutiny applies when

(1) groups must disclose information about those that choose to associate with them or

(2) groups or individuals must disclose with whom they choose to associate.

Before the United States Supreme Court began using the term "exacting scrutiny," the Court consistently applied this type of heightened scrutiny to safeguard associational freedoms that were burdened as a result of compelled disclosure requirements. As the Court stated:

> It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute . . . [an] effective . . . restraint on freedom of association . . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

*Nat'l Ass'n for Advancement of Colored People*, 357 U.S. at 462.

In sum, exacting scrutiny does not automatically apply whenever the government requires the disclosure of facts relating to political information. Instead, the disclosure requirement must also burden associational freedoms. *See Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 482, 166 P.3d 1174 (2007) ("[C]ompelled disclosure may encroach on First Amendment rights by infringing on the privacy of association and belief." (citing *Buckley*, 424 U.S. at 64)).

Accordingly, depending on whether a disclosure regulation infringes on associational rights, a court's level of review may be deferential instead of exacting.

7

B.      Deferential Scrutiny Generally Applies to Commercial Disclosure Requirements

Our level of review for commercial speech depends on whether the government regulation restricts commercial speech or merely requires an entity to provide factual disclosures. *Chong Yim*, 194 Wn.2d at 678.

In contrast to laws burdening associational rights, laws requiring commercial speakers to provide purely factual disclosures are generally subject to deferential review. "[I]f the law merely requires factual disclosures by commercial speakers, review is deferential because a person's 'constitutionally protected interest in *not* providing any particular factual information in [their] advertising is minimal.'" *Id.* (quoting *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985)).

The deferential scrutiny inquiry asks whether the disclosure requirements are reasonably related to the State's interest in preventing the deception of consumers. *Id.* Even then, if the restriction is unjustified or unduly burdensome, it cannot survive deferential review. *Id.*

The *Zauderer* Court applied deferential review to a state's regulation of attorney advertising. The regulation required attorneys who advertised that their fees were contingent to provide information that clients were responsible for litigation costs. *Zauderer*, 471 U.S. at 650-51. The Court reasoned that the law did not prohibit commercial speakers from conveying any information to the public but, instead, "only

8

required them to provide somewhat more information than they might otherwise be inclined to present." *Id.* at 650.

We have followed this reasoning in reviewing similar factual disclosure requirements imposed on commercial actors. For instance, in *Chong Yim*, we applied deferential review to a requirement that landlords provide facts about their rental criteria to prospective tenants. 194 Wn.2d at 679. The requirement survived deferential review because it was directly connected to the city's interest in ensuring the same rental criteria applied to all applicants, combating bias in Seattle's rental housing market. *Id.* at 679-80. We emphasized that landlords were required to disclose only the rental criteria that they set for themselves. The regulation imposed only a minimal burden on landlords and allowed landlords to exercise their free speech rights in other ways. *Id.* at 680.

Recently, the Supreme Court in *Moody v. NetChoice, LLC*, 603 U.S. 707, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024), suggested that the deferential review standard from *Zauderer* applies to government regulations imposed on social media platforms that require them to disclose certain information to their users. The Court's opinion illuminates how social media disclosures fit into the commercial speech context.

In *NetChoice*, the Court reviewed circuit court decisions surrounding the constitutionality of Florida and Texas laws imposing speech-related requirements on social media platforms. Those two states adopted regulations requiring social media platforms to disclose to affected users their reasoning for removing content. *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022), *vacated and remanded sub*

9

*nom.*, *NetChoice, LLC*, 603 U.S. 707; *NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022), *vacated and remanded sub nom.*, *NetChoice, LLC*, 603 U.S. 707. Both the Eleventh and Fifth Circuit Courts of Appeal held that the individualized-explanation requirements required disclosure only of purely factual information about social media platforms' conduct toward users and the terms under which their services were available. *NetChoice*, 34 F.4th at 1227; *NetChoice*, 49 F.4th at 485. Therefore, those two circuit courts applied the lower-level deferential scrutiny from *Zauderer* to the requirements. *NetChoice*, 34 F.4th at 1230; *NetChoice*, 49 F.4th at 485.

Following these decisions, the *NetChoice* Court reviewed the First Amendment facial challenges to the various laws. The Court did not decide whether the laws violated the First Amendment. Instead, the Court provided guidance regarding the applicable standards of review. The *NetChoice* Court suggested *Zauderer*'s deferential review was the standard for reviewing the individualized-explanation provisions. *NetChoice*, 603 U.S. at 725.

The regulations at issue here are similar to the individualized-explanation requirements at issue in *NetChoice*. Washington's FCPA provisions require social media platforms to disclose facts about the content it hosts on its platform for the purpose of informing users of its operations. Therefore, the deferential standard of review is the correct standard to apply here.

C.      Deferential Scrutiny, Not Exacting Scrutiny, Should Apply Here

Because the FCPA does not burden associational rights, and instead only regulates

the disclosure of facts related to platforms' content, this court should review the

provisions under a deferential standard.

The lead opinion applies exacting scrutiny because the disclosure requirements are

election-related.[4]  However, while exacting scrutiny often applies in reviewing election-

related disclosure requirements, this level of review does not apply merely because the

disclosure requirement is election related.  As discussed above, associational rights must

also be burdened.

Associational rights were burdened in all the leading election-related cases that

applied exacting scrutiny.  In *Buckley*, the Court applied exacting scrutiny in reviewing

the Federal Election Campaign Act's disclosure provision requiring political committees

to keep detailed records of contributions and expenditures.  424 U.S. at 64 ("[W]e have

repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of

---

[4] The lead opinion asserts that while "not a perfect analogy," the United States Supreme Court's review of political disclosure laws aimed at broadcasters supports applying exacting scrutiny here.  Lead opinion at 15 (citing *McConnell*, 540 U.S. at 237-38).  However, the *McConnell* Court did not explicitly apply exacting scrutiny to the disclosure requirements there.  *See* 540 U.S. at 245 ("Given the FCC regulations and their history, the statutory requirements must survive a *facial* attack under any potentially applicable First Amendment standard, including that of heightened scrutiny."); *Hum. Life of Wash. Inc.*, 624 F.3d at 1004 ("The *McConnell* Court did not explicitly describe the level of scrutiny applied to the disclosure requirements, stating only that the requirements were supported by 'important state interests.'" (quoting *McConnell*, 540 U.S. at 196)).  Given the clear weight of case law that applies exacting scrutiny only when a disclosure requirement burdens associational freedoms, I am not convinced *McConnell* is the right analogy here.

association and belief guaranteed by the First Amendment.").  The challengers were several individual candidates for federal office, as well as political parties and organizations who feared the regulation would chill people from associating with them. *Id.* at 65-69.

In *Citizens United*, exacting scrutiny applied when a nonprofit organization that funded a campaign video challenged laws that required those who funded electioneering communications to disclose their identities.  558 U.S. at 319, 366.  The organization argued that such disclosure requirements could chill donations to an organization and cause its members to face retaliation by making their support publicly known.  *Id.* at 370.

This court also applies exacting scrutiny where disclosure requirements burden associational freedoms.  In *Grocery Manufacturers Association*, a trade association challenged Washington's FCPA disclosure and registration requirements after it failed to disclose which of its members contributed financially to a political committee.  195 Wn.2d at 448.  Exacting scrutiny applied because the regulation burdened the group's associational freedoms by requiring it to make disclosures about its supporters.  *Id.* at 461 ("'[C]ompelled disclosure may encroach on First Amendment rights by infringing on the privacy of association and belief.'" (quoting *Voters Educ. Comm.*, 161 Wn.2d at 482)).

In contrast to all these cases, the disclosure requirements here do not burden Meta's, the challenger's, associational freedoms.  Although the FCPA requirements may relate to political or election advertisements, that alone does not trigger exacting scrutiny.

Meta is not an association espousing any ideas or beliefs in this context. Meta does not have associational rights burdened by having to provide information for all political advertisements it hosts on its platforms, regardless of affiliation. In addition, advertisement sponsors are not chilled from associating with Meta's ideas or beliefs because of the disclosure requirements. This case does not fit into our nation's exacting scrutiny precedent. Heightened scrutiny does not apply to this challenge.

Instead, the disclosure laws here merely require a commercial platform to disclose facts related to its commercial services—hosting paid advertisements on its sites.

In sum, the FCPA and its implementing legislation deal with factual disclosures in the commercial speech context. Just because the advertisements relate to elections does not mean that exacting scrutiny is the correct standard of review. Instead, because associational rights are not burdened here, deferential review applies, just like in other commercial speech disclosure cases.

I concur with the lead opinion that the requirements would survive even under a heightened standard of review. However, the State does not need to meet this higher burden.

III

META ADMITS THAT IT VIOLATED THE FAIR CAMPAIGN PRACTICES ACT. ACCORDINGLY, IT IS SUBJECT TO PENALTIES FOR "EACH VIOLATION"

Meta agrees that it violated the FCPA. Suppl. Br. of Pet'r at 2, 22, 25. However, Meta challenges the way the trial court calculated damages.

Former RCW 42.17A.750(1)(c) (2019) provides that "[a] person who violates any of the provisions of this chapter may be subject to a civil penalty of not more than ten thousand dollars for each violation." Our goal is to discern the legislature's intent behind the penalty statute. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). The legislature did not define what the term "each violation" means except by defining what it is not: a "violation" is "not a remediable violation, minor violation, or an error classified by the commission as appropriate to address by a technical correction." Former RCW 42.17A.005(54) (2025).

Meta argues that when a person makes a request, that request, no matter how many advertisements it is seeking information for, will result in only one violation. That does not follow the legislative intent manifested in the statutory scheme.

This statute requires Meta to keep certain information about each political advertisement that it runs. A violation occurred each time Meta failed to make available all the required information for any particular advertisement. Under Meta's view, the penalty would be the same whether the request seeks information for a single advertisement or 100. This goes against the statutory scheme, which is intended to promote transparency surrounding political advertisements. The legislature intended that certain information be publicly available for each advertisement. As the Court of Appeals stated, and with which the lead opinion agrees, the statutory scheme shows an "intent to preserve and sunlight relevant data of each individual ad . . . without any requirement that any particular voter or the government step into the sunlight to inspect

14

the records." *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138, 197, 560 P.3d 217 (2024). When that required information is not made publicly available for an advertisement, there is a violation. Violations run per advertisement, not per request.

The lead opinion views it differently. It holds that the total number of violations is calculated by multiplying the number of advertisements with undisclosed information by the number of requests for that information. Lead opinion at 33. The legislature could have included language that would have resulted in imposing penalties per request, but it did not. Instead, the legislative scheme requires social media platforms to make information available for each political advertisement. A failure to make that information publicly available results in one violation for each advertisement, regardless of the number of requests for that same information.

The lead opinion argues that the legislature intended the statute to be liberally construed to provide for maximum disclosure. That is true. However, a liberal construction does not allow us to exceed the legislature's intent. Indeed, the legislative intent behind the penalty provision is to maximize the disclosure of information, not to maximize the penalty amount. Therefore, the court should not strain to construe the provision to maximize penalties. As discussed above, calculating violations per advertisement, instead of per request, is in line with a liberal construction of the provision.

While I disagree with the lead opinion's conclusion that the trial court properly calculated the penalties, I agree that the judgment of $35,182,159.59 is not an excessive

15

fine that violates the Eighth Amendment to the United States Constitution, assuming without deciding that the Eighth Amendment applies here.

IV
CONCLUSION

The Fair Campaign Practices Act required Meta to maintain and make publicly available facts about advertisements hosted on its platform. Meta, an entity that has experience with public disclosure requirements and has the resources to ensure that it complies with disclosure laws, intentionally failed to make available the following information about the political advertisements it ran:

- The street address of the individual sponsor that paid for the advertisement;

- The payment dates, payment methods, and exact cost per advertisement;

- The targeted audience; and

- The number of impressions.

The disclosure of this information does not burden Meta's associational rights nor does it burden the associational rights of those paying for the political advertisements. Because this is commercial speech that does not burden associational rights, we should apply a deferential, not exacting, standard of review. However, even applying the exacting standard of review, I agree with the lead opinion that there is no First Amendment violation.

The FCPA requires that a social media platform must make certain information available to the public regarding political advertisements. When a social media company

fails to provide all the required information, that is a violation of the act.  The number of requests for the same information does not result in additional violations.

I accordingly would affirm the trial court's conclusion that there is no First Amendment violation but reverse on the amount of penalties it imposed.  I instead would direct it to calculate violations based on each advertisement for which Meta failed to transparently disclose required information.

Mungia, J.

González, J.

Montoya-Lewis, J.

No. 103748-1

GORDON McCLOUD, J. (dissenting)—Political advertising is political speech.[1] Whether we like the content of that speech or not, it is entitled to the highest protection.[2] For that reason, laws (like the FCPA[3]) that burden political speech violate the First Amendment unless those laws further a compelling state interest by the least restrictive means possible.[4] U.S. CONST. amend. I.

In this case, all parties agree that the FCPA serves an important or even compelling state interest: shedding light on Washington state campaign funding and

---

[1] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-40, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) ("The First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" (internal quotation marks omitted) (quoting *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 223, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989))).

[2] *Id.*

[3] Fair Campaign Practices Act, former ch. 42.17A (2024). Former chapter 42.17A has since been recodified as Title 29B RCW, effective January 1, 2026. Former chapter 42.17A RCW will be referenced throughout as it applied to Meta at the time of the action.

[4] *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011) ("'Laws that burden political speech are' accordingly 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" (quoting *Citizens United*, 558 U.S. at 340)).

targeting. But the parties disagree about whether the FCPA has chosen a permissible means or, instead, a means that unduly burdens the digital platform involved here—Meta Platforms Inc.—with oppressive costs and business interference. In fact, the parties submitted competing proof about the extent of the costs and interference that the FCPA imposed. When that happens, a jury is supposed to decide who to believe. The lead opinion, however, affirms the trial court's decision to believe the State over Meta.

I disagree. I would remand to the trial court for fact-finding on the competing proof that the two sides have offered about the FCPA's burdens.

The lead opinion then turns to the sanction. The Eighth Amendment bars the State from imposing monetary sanctions that are grossly disproportionate compared to the illegal conduct.[5] U.S. CONST. amend. VIII. When making this comparison, courts must consider the defendant's actual, concrete, illegal actions; courts cannot consider the possible impact of all such conduct on general societal values in the abstract.[6] In this case, the trial court found that Meta committed partial reporting

---

[5] *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998).

[6] *Id.*; *Thomas v. Humboldt County*, 124 F.4th 1179, 1193 (2024) ("'It is critical . . . that the court review the specific actions of the violator rather than by taking an abstract view of the violation.'" (quoting *Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020))), *cert. denied*, 146 S. Ct. 27 (2025).

violations unconnected to any underlying illegal conduct. Nevertheless, the trial court imposed a sanction totaling $35 million—the highest sanction ever in the history of this state or this country for noncompliance with reporting laws. The lead opinion affirms.

Again, I disagree. Under controlling Supreme Court precedent on the application of the Eighth Amendment to reporting violations, we must consider Meta's conduct at a concrete level of specificity, not a high level of generality about societal values. Here, Meta committed partial reporting violations combined with broad disclosure of other requested information and no allegations of other, underlying illegalities. That does not support the highest penalty ever imposed for partial violations of administrative reporting rules in the history of this state or this country.[7]

I therefore respectfully dissent.

---

[7] Press Release, Wash. State Off. of Att'y Gen. (Oct. 26, 2022) (the penalty imposed on Meta "represents the largest campaign finance penalty anywhere in the country—ever") https://www.atg.wa.gov/news/news-releases/judge-grants-ag-ferguson-s-request-maximum-246m-penalty-against-facebook-parent [https://perma.cc/247H-LFMC].

FACTUAL AND PROCEDURAL BACKGROUND

I.    THE FCPA AND THE 2018 REGULATION

The FCPA requires a "commercial advertiser" who has "accepted or provided political advertising or electioneering communications during the election campaign" to "maintain current books of account and related materials as provided by rule." Former RCW 42.17A.345(1) (2019).[8] Those documents and books of account "shall specify" the names and addresses of persons from whom the commercial advertiser accepted political advertising or electioneering communications, the exact nature and extent of the services rendered, and the total cost and the manner of payment for the services. *Id*. Those documents and books of account "shall be open for public inspection during normal business hours during the campaign and for a period of no less than five years after the date of the applicable election." *Id*.

The legislature delegated the task of adopting regulations to implement and enforce the FCPA to the Public Disclosure Commission (PDC). Former RCW

---

[8] A "commercial advertiser" is "any person that sells the service of communicating messages or producing material for broadcast or distribution to the general public or segments of the general public . . . for the purpose of appealing, directly or indirectly, for votes or for financial or other support in any election campaign." Former RCW 42.17A.005(10) (2025).

42.17A.110(1) (2019), .345(1). This case involves one of the regulations that the PDC adopted: WAC 390-18-050. That regulation provides the details of commercial advertisers' responsibilities under former RCW 42.17A.345.

In 2018, the PDC updated that regulation to specify that digital communication platforms that host political advertisements count as "commercial advertisers." Former WAC 390-18-050(1) (2018).[9] That updated regulation provided that the "information and books of account" that commercial advertisers must keep open for public inspection under former RCW 42.17A.345 must also include the name of the candidate or ballot measure supported, opposed, or otherwise identified, and whether the ad supports or opposes the candidate or ballot measure; the name and address of the sponsors or persons paying for the advertising or electioneering communication; the advertisement's "total cost" or "initial cost estimate if the total cost is not available upon initial distribution or broadcast," as well as "how much of that amount has been paid, as updated, who made the payment, when it was paid, and what method of payment was used"; and the dates the commercial advertiser rendered service. Former WAC 390-18-050(5)(a)-(d); WAC 390-18-050(6).

---

[9] The rule has been amended numerous times since 2018. Some of its requirements remain the same. For clarity, I identify which version of the rule I cite.

5

In addition to that information, the regulation also provides that the "materials and books of account open for public inspection" must include the advertisement or electioneering communication itself, as well as "a description of the major work components or tasks . . . that were required to provide the advertising or communications services." Former WAC 390-18-050(6); WAC 390-18-050(7).

At the time of the requests in this case, those "work components or tasks" included (for digital communication platforms like Meta) "[a] description of the demographic information (e.g., age, gender, race, location, etc.) of the audiences targeted and reached, to the extent such information is collected by the commercial advertiser as part of its regular course of business, and the total number of impressions generated by the advertisement of communication." Former WAC 390-18-050(6)(g).[10]

The regulation also provides detailed requirements about how commercial advertisers must keep their current books of account and related materials open for public inspection. Both the current and former versions require that this information

---

[10] This was the language used in versions of the rule effective between December 31, 2018, and March 6, 2022, which encompassed the time period when the three individuals in this case made their requests. The current version of the rule imposes more detailed requirements for what information must be included in the "description of the major work components or tasks." WAC 390-18-050(7).

"must be available for public inspection by any person" and accessible in person during normal business hours or electronically. WAC 390-18-050(4); former WAC 390-18-050(3). The version of the regulation in effect when requests were made in this case provided that an advertiser must either digitally transmit the records to the requestor "promptly upon request" or publish the records online on its primary website or on a website created for the purpose of publishing the information. Former WAC 390-18-050(3)(b).[11] It also requires that "[i]nformation contained in books of account must be updated within 24 hours of the time when an advertisement or communication initially has been publicly distributed or broadcast, and within 24 hours of any update or change to such information." WAC 390-18-050(3).

II.     META BANS WASHINGTON POLITICAL ADVERTISEMENTS IN 2018

Prior to the updated regulation, Meta hosted Washington political advertisements on its platforms. Meta contends that "digital advertising on platforms like Facebook is especially important for smaller campaigns that lack the resources to reach voters through more expensive and traditional means." Clerk's Papers (CP) at 399.

---

[11] The current version of the rule states that the information must be provided "promptly upon request, but no later than two business days." WAC 390-18-050(4)(b)(i).

But in response to the updated regulation, Meta announced that beginning December 28, 2018, it would no longer accept advertisements "that relate to Washington's state or local elected officials, candidates, elections or ballot initiatives." CP at 615. Meta was concerned with the technical feasibility and financial burden of compliance with the law. CP at 390.

Despite the ban, political advertisements have appeared on Meta platforms since 2018 in violation of Meta's policy. "Meta uses multiple levels of both automated and human review to block prohibited ads in Washington." CP at 393. However, "because Facebook uses a self-service advertising portal, unauthorized ads sometimes slip through Facebook's screening processes." Pet. for Rev. at 9 (citing CP at 7452).

III. META CREATES AD LIBRARY IN 2018, WHICH DISPLAYS SOME BUT NOT ALL OF THE INFORMATION REQUIRED TO BE DISCLOSED BY THE FCPA

In 2018, Meta launched a publicly accessible "Ad Library." It provides certain information about ads relating to "social issues, elections, or politics" across multiple jurisdictions. CP at 7007-08. As the lead opinion notes, "neither party disputes that much of the information required by Washington's disclosure law is included in Meta's Ad Library, but not all." Lead opinion at 5 (citing CP at 5859-60). Specifically, the Ad Library does not include "street addresses of sponsors, exact

cost per advertisement, payment dates, payment method, precise audience targeted, and exact of number of impressions (though the Ad Library contains number of impressions expressed as a range)." CP at 390.

Meta concedes that it collects and maintains all that information in its regular course of business. Suppl. Br. of Pet'r Meta Platforms, Inc. at 25. However, as discussed below, it disputes the State's assertion that it would be simple and inexpensive to alter the Ad Library to display all that information or to individually gather the information in response to individual requests.

IV.    THREE INDIVIDUALS REQUEST INFORMATION ABOUT WASHINGTON POLITICAL ADS HOSTED ON META; PDC INVESTIGATES

This case concerns a total of 12 requests for records made by three members of the public. In February 2019, journalist Eli Sanders requested information relating to four Seattle city council races and a ballot measure. CP at 256. In July 2019, Tallman Trask requested information about advertising relating to numerous Seattle political campaigns and city council candidates. CP at 8067. In July 2021, Sanders requested all information for all Washington political ads hosted by Meta from January 1 to July 12, 2021. CP at 7587. Sanders and Trask filed complaints with the PDC when Meta failed to timely and completely comply with their requests. CP at 256-57.

9

The PDC investigated the complaints. CP at 258. During the investigation, Meta "admitted that it does not make publicly available all of the information required by [former] RCW 42.17A.345 and WAC 390-18-050 for Washington political advertisements found on its platform." CP at 12. The PDC voted to refer the Sanders and Trask complaints to the attorney general for enforcement pursuant to former RCW 42.17A.755(4) (2019).

In April 2020, the State sued Meta for violating the FCPA by failing to disclose the political ad information requested by Sanders and Trask. CP at 1. The State amended the complaint when it learned that between 2019 and 2021, another member of the public, Zach Wurtz, had made nine requests for information about a variety of Washington political ads from Meta. CP at 425. Wurtz's final request asked "'to inspect the public file for every political ad shown in Washington State since 2016.'" CP at 5574. Meta failed to timely and completely comply with the requests. CP at 258.

V.     SUPERIOR COURT GRANTS SUMMARY JUDGMENT IN FAVOR OF STATE

Both parties moved for summary judgment. In October 2022, the trial court granted the State's motion for summary judgment and denied Meta's motion for summary judgment. CP at 5571.

The trial court determined that Meta violated the FCPA 822 times. CP at 5575, 5784. It counted 411 advertisements responsive to Sanders' and Trask's requests for which Meta failed to provide complete information. CP at 5575. It then doubled that number to reflect the fact that Wurtz's requests also covered those same ads (although Wurtz's requests actually covered far more than 411 ads). CP at 5574-75.

The trial court entered judgment in favor of the State. CP at 5783. It imposed the maximum statutory penalty of $10,000 per violation on each violation, then trebled that total under former RCW 42.17A.780 (2018) because it determined the violations were intentional, for a total fine of $24,660,000.00. CP at 5578, 5784-85. The trial court also awarded $3.5 million in attorney fees and costs, which it trebled to $10,522,159.59 pursuant to former RCW 42.17A.780. CP at 5812. The total fine and costs assessed against Meta amount to $35,182,159.59—the highest campaign finance violation penalty in United States history.[12]

On appeal, Meta argued that the FCPA and its implementing regulations violate the First Amendment as applied to Meta; that the superior court erred in interpreting the statute to permit the imposition of a penalty for each advertisement included in the requests, rather than a penalty for each request; and that the fine was

___

[12] Press Release, *supra* n.7.

11

so excessive that it violated the Eighth Amendment. The Court of Appeals rejected

Meta's arguments and affirmed. *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138,

560 P.3d 217 (2024). We accepted review and we must address the same questions.

4 Wn.3d 1020 (2025).

ANALYSIS

I.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON
      THE FIRST AMENDMENT ISSUE, REGARDLESS OF WHETHER STRICT OR
      EXACTING SCRUTINY APPLIES

Meta argues that the disclosure requirements imposed by the FCPA and its

implementing regulations (together, the "disclosure law") violate its First

Amendment rights. It argues that the court must apply strict scrutiny to its First

Amendment claim because the disclosure law is a content-based regulation that

targets political speech. Meta also argues that the existence of genuine issues of

material fact related to the extent of the law's burden on its First Amendment rights

made summary judgment inappropriate.

The lead opinion disagrees. It adopts exacting scrutiny as the correct standard

to evaluate Meta's First Amendment claim.

Meta is probably correct that strict scrutiny applies to its First Amendment

claim, as discussed below. But even if exacting scrutiny applies, the lead opinion

still errs in holding that the costs and burdens that the FCPA imposes on Meta are insignificant and, hence, that they satisfy that test's "narrow tailoring" requirement. Lead opinion at 19-20. Instead, the record shows that Meta establishes genuine issues of material fact concerning the burden that the law imposes on Meta's First Amendment rights and, hence, on whether that law is "narrowly tailored" enough to satisfy the First Amendment.

I would therefore reverse the trial court's decision to grant summary judgment to the State.

> *A. The lead opinion does not meaningfully consider the distinctions between disclosure laws that target political speakers and disclosure laws (like the FCPA) that target neutral third-party platforms (like Meta); the latter place far more burdens on speech, are more suspect, and hence must be subject to strict scrutiny (the more speech-protective standard)*

Meta argues that the disclosure law is subject to strict scrutiny because it is a content-based regulation of speech: it applies only to political speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 165, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S. Ct. 1505, 123 L. Ed. 2d 99 (1993))). To

survive strict scrutiny, the State must show that the law "'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Id.* at 171 (internal quotation marks omitted) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011)). Under strict scrutiny, a law is "narrowly tailored" when it is the least restrictive alternative for achieving the State's goal. *McCullen v. Coakley*, 573 U.S. 464, 478, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014).

The lead opinion disagrees that strict scrutiny is appropriate. It holds that exacting scrutiny—a less speech-protective standard—applies because the law is a campaign-related disclosure law that does not burden speech that much. To survive exacting scrutiny, the State must show that the law (1) bears a substantial relation to a sufficiently important government interest and (2) is narrowly tailored to accomplish that interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021). Under exacting scrutiny, the narrow tailoring requirement requires a "'reasonable'" fit between the State's interest and the means used to accomplish that interest, though it need not be the "'least restrictive means'" of achieving the state's important interest. *Id.* at 609-10 (internal quotation marks omitted) (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014) (plurality opinion)). This means-

14

end fit requirement means that a state "is not free to enforce *any* disclosure regime that furthers its interests." *Id*. at 613.

Thus, the costs and burdens of compliance with a law are highly relevant to determining whether the law is narrowly tailored to achieve an important government interest. *Smith v. Helzer*, 95 F.4th 1207, 1217 (9th Cir.) (considering the financial and time-based burdens of a disclosure law on campaign contributors as part of the exacting scrutiny narrow tailoring requirement), *cert. denied sub nom., Smith v. Stillie*, 145 S. Ct. 567 (2024). And when the regulated entity is a business, the way the costs and burdens of the law affect the entity's business decisions are naturally relevant to considering the law's means-end fit.

To be sure, both the United States Supreme Court and this court have applied the exacting scrutiny standard to other campaign finance disclosure laws. *E.g., Buckley v. Valeo*, 424 U.S. 1, 63, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (campaign finance law required political committees and candidates to disclose information); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (campaign finance law required political action committees to disclose information); *State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 893, 502 P.3d 806 (2022) (*GMA* II) (FCPA requires candidates and political committees to disclose campaign finance information). As the lead opinion recognizes, the Supreme Court

15

has explained that exacting scrutiny is the appropriate standard for evaluating the constitutionality of campaign finance disclosure laws because such laws "'do not prevent anyone from speaking,'" as opposed to laws that place a ceiling on political speech (like campaign contribution limits), which do limit speech and hence which receive strict scrutiny. *Citizens United*, 558 U.S. at 366 (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 201, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. 310).

But none of those decisions analyzed campaign finance-disclosure laws that targeted third-party platforms that host political ads, like Meta does (as opposed to targeting the candidate or the campaign). And, as the lead opinion acknowledges, neither the United States Supreme Court nor this court has decided what level of scrutiny applies to this situation. Lead opinion at 14.

The lead opinion adopts the exacting scrutiny standard for this new situation without really grappling with the distinctive burdens the FCPA places on the targeted platform or the speech-chilling effects it has on the platform and its potential users. But those considerations are important—under controlling precedent, the extent of the law's burden on free speech basically determines the level of scrutiny the law must receive. *Buckley*, 424 U.S. at 67-68 (considering speech-chilling effect of campaign finance disclosure law on campaign contributors); *Ams. For Prosperity*,

16

594 U.S. at 610 (considering extent to which law requiring charities to report top donors to state attorney general had potential speech-chilling effect on donors); *see also Collier v. City of Tacoma*, 121 Wn.2d 737, 752, 854 P.2d 1046 (1993) (in analyzing whether yard sign regulation violated state constitutional free speech protections, court considered that the regulation tended to benefit the well-known incumbent at the expense of "[t]he underfunded challenger . . . who relies on the inexpensive yard sign to get his message before the public").

Given the critical importance of the extent of the law's burden on free speech to determining the applicable standard of scrutiny, we must pay careful attention to the fact that the FCPA and its implementing regulation are not ordinary campaign finance disclosure laws. As the Fourth Circuit Court of Appeals explained in *Washington Post v. McManus*, "While ordinary campaign finance disclosure requirements do not 'necessarily reduce[] the quantity of expression,' the same cannot be said for platform-based laws." 944 F.3d 506, 517 (4th Cir. 2019) (alteration in original) (citation omitted) (quoting *Buckley*, 424 U.S. at 19).

*Washington Post* dealt with a Maryland campaign finance disclosure law that, like the instant law, applied to third-party platforms.[13] The Fourth Circuit declined

---

[13] The lead opinion says that *Washington Post* does not apply here because it did not specifically address issues related to social media platforms. To be sure, *Washington Post* dealt with a challenge to the disclosure law as applied to newspapers that hosted online

to decide whether strict or exacting scrutiny applied because it held that the law failed even exacting scrutiny. The court began by considering the distinct consequences of the platform-based law on political speech. It explained that "[b]ecause political actors and neutral third-party platforms operate under markedly different incentives, the consequences of a disclosure law vary starkly depending on where its burdens are placed." *Id.* at 517. The "organic desire" of political groups to succeed at the ballot box "generally offsets, at least in part, whatever burdens are posed by disclosure obligations." *Id.* at 516. By contrast, "platform-based campaign finance regulations like the one here make it financially irrational, generally speaking, for platforms to carry political speech when other, more profitable options are available." *Id.* Thus, "when the onus is placed on platforms, we hazard giving government the ability to accomplish indirectly via market manipulation what it cannot do through direct regulation—control the available channels for political discussion." *Id.* at 517 (citing *Reed*, 576 U.S. at 168). The court noted that the risk

---

advertisements, not to social media platforms like Meta. But *Washington Post*'s discussion of the distinct burdens imposed by a platform-based disclosure law was not limited to that context. *See Wash. Post*, 944 F.3d at 517 (stating that the law's First Amendment problems discussed above "are compounded" by the application of the law to newspapers); *cf.* lead opinion at 23 (mischaracterizing the entirety of *Washington Post* as applying only to newspapers).

of a chilling effect on political speech had already begun, as Google had announced it would stop hosting political ads in the state. *Id.* at 516-17.

In short, the *Washington Post* court took seriously the fact that the platform-based disclosure law had a chilling effect on political speech. And it took this into account when considering whether the law was narrowly tailored under the exacting scrutiny analysis. That approach aligns with United States Supreme Court precedent. After all, exacting scrutiny requires a reasonable fit between the means and ends of a law, such that a state "is not free to enforce *any* disclosure regime that furthers its interests" at any cost. *Ams. For Prosperity*, 594 U.S. at 613. A court applying exacting scrutiny must carefully consider the extent of those costs in determining whether a law is narrowly tailored.

The lead opinion takes the opposite approach. It concludes that Meta's decision to ban Washington political ads is irrelevant—that it "does not impact this court's exacting scrutiny analysis." Lead opinion at 24; *see also id.* at 25, 25 n.11. It does not explain why such an obvious burden on political speech is irrelevant.

The lead opinion also fails to acknowledge that the means-ends analysis does not end with the determination that it is literally possible for Meta to comply with the law, regardless of the burden on its finances or business model. *Id.* at 25-26 (framing the question as whether Meta presented a genuine issue of material fact

regarding "its inability to comply"). Rather, the question is whether there is a reasonable fit between the State's goal of election transparency and the means the State uses to attain that goal. If the result of the law is that a platform shuts down opportunities for political speech that it used to provide, there is a strong argument that the law is not narrowly tailored—even if compliance with the law is literally possible. *See Washington Post*, 944 F.3d at 517 ("Government policies that foreclose channels for political speech or simply crowd out too much political speech . . . pose especially serious constitutional dangers." (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167-68, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002))). After all, "[t]he First Amendment guards against 'any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.'" *Id.* (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 249-50, 56 S. Ct. 444, 80 L. Ed. 660 (1936)).

In sum, the lead opinion fails to acknowledge that "[d]isclosure obligations applied to neutral-third party platforms are . . . , from a First Amendment perspective, different in kind from conventional campaign finance regulations." *Id.* at 516. It is important to consider these distinctions when analyzing whether a platform-targeted disclosure law is narrowly tailored.

But here as in *Washington Post*, it is unnecessary for us to decide which level

of scrutiny applies. That's because even under the less-demanding exacting scrutiny

standard, Meta identifies material issues of fact that preclude summary judgment on

the issue of whether the law is narrowly tailored.

> B.  *Even if exacting scrutiny applies, Meta has set forth facts sufficient to establish a genuine issue of material fact about whether the disclosure law is unduly burdensome*

As discussed above, the extent of the burden that the law places on Meta is

highly relevant to determining whether that law is narrowly tailored to achieve the

State's goal of an informed electorate.

In this case, Meta argues that the FCPA fails the narrow tailoring requirement

because it is unduly burdensome for such a third-party platform to comply. In fact,

the law imposes such serious financial and technical burdens, and such steep

potential penalties for violations, that Meta has concluded it is financially irrational

to continue hosting Washington political ads on its platforms. The result is that a

major platform for political speech is no longer accessible. Meta provided evidence

that this particularly affects "smaller campaigns that lack the resources to reach

voters through more expensive and traditional means" like television or radio. CP at

399 (Def.'s Mot. for Summ. J.) (quoting declarations from Washington politicians

and campaign managers).

The State presented expert evidence that it would be inexpensive and technically uncomplicated for Meta to comply with the law. Meta presented conflicting expert evidence that it would be expensive and technically complex to comply with the law.

The lead opinion concludes that Meta's evidence amounts to "'"'speculative" generalities which lack the "specificity" to create a genuine issue of material fact.'" Lead opinion at 26 (quoting *Meta*, 33 Wn. App. 2d at 173-74). The lead opinion primarily reaches this conclusion because it says that Meta failed to "provide specific details about what compliance with Washington's FCPA would actually cost." *Id.* at 26-27.

The record does not support this characterization. In fact, Meta has provided detailed and specific explanations about why compliance is burdensome. Meta presented specific evidence to substantiate its arguments that, among other things, (1) identifying which ads are covered by the law is technically and financially burdensome and (2) reporting the data to the requester, particularly within 48 hours, is unduly burdensome. It's true that Meta has not quantified its burden with a specific dollar figure. But the lead opinion points to no authority imposing such a requirement.

### i. Meta provided nonspeculative facts to rebut the State's argument that it can cheaply and easily identify Washington political ads

The State argues that determining whether an ad is covered by the disclosure law is not an unnecessary burden because "Meta already knows how to and does identify political ads based on a definition." Resp't State of Wash.'s Answer to Pet. for Rev. at 16 n.3.

Meta has set forth nonspeculative facts that show that there is a genuine dispute about how technically difficult and expensive it would be to comply with the law. That difficulty begins with identifying which advertisements are covered by the law. Meta's expert, Dr. Steven Weber, provided a detailed explanation of why and how it is difficult for Meta to identify which ads are covered by the law. CP at 7869-80.

First, the law does not require purchasers of an ad to flag whether the ad is a Washington political ad when placing it on the platform. CP at 7859. Even if it did, Meta would still need to implement a process to accurately determine which ads are covered by the law to ensure compliance in cases where a purchaser fails to correctly indicate the ad's status. To accurately determine whether an ad is covered, Meta would need to know the full set of candidates and ballot propositions at any given time in Washington—a challenging task. CP at 7872. Nearly 7,000 candidates filed

for office at the state, judicial, and county level in 2020, not including candidates who subsequently withdrew. *Id.* There were 47 statewide ballot initiatives proposed, and even more at the county and subcounty levels. CP at 7872-73. No currently existing database compiles all this information. CP at 7869.

Even if Meta could create a real-time, updated database of all Washington candidates and ballot propositions, it would still face challenges in identifying Washington political ads because of the breadth of the statutory definition of "political advertisement." CP at 7873. An advertisement constitutes "political advertising" if it "directly or *indirectly*" appeals for "financial or *other support*" in a Washington election. Former RCW 42.17A.005(40) (2025) (emphasis added). The FCPA also applies to "electioneering communications," which includes ads that "identif[y] the candidate without using the candidate's name." Former RCW 42.17A.005(21)(a)(i). These broad definitions mean that it can be challenging even for the PDC to identify whether an ad is a Washington political ad: "For example, the Executive Director of the PDC cited an advertisement that merely asked voters to call their political representatives on a particular issue, without suggesting a stance on that issue, as an example of a 'gray area' under the law's definition." CP at 7874 (citing deposition of Peter Lavallee (PDC executive director) (May 7, 2021)).

24

Meta already uses machine learning as part of its general ad review system, including using it to identify ads that relate to "'social issues, elections or politics.'" CP at 7878. However, Dr. Weber explained that Meta's current "machine learning system cannot serve as the exclusive solution to classify whether an advertisement falls under the Washington Disclosure Law specifically." *Id*. Creating an algorithm to classify advertisements would "require substantial human input to build, and the computer's prediction will not necessarily be accurate, including in situations where humans themselves struggle to categorize differences or the categories are inherently highly similar." CP at 7876. "[A] significant amount of coding work and system development is required to write and refine algorithms that are efficient and accurate." *Id*.

Machine learning models must be "trained" with large batches of training data to help the system "learn" to properly classify information. *Id*. Training data consist of manually labeled examples—on the scale of thousands or even millions of manually labeled images. CP at 7876-77. Dr. Weber explains the complexity of training a machine learning model to specifically recognize Washington political ads given the broad statutory definition of a political ad combined with the limited data set available: "The need to identify *Washington* elections, candidates, and ballot propositions in particular means that very specific examples would have to be used

25

in the training data in order to teach the machine to distinguish Washington Political Ads from other types of political advertising. But a candidate or ballot proposition in the State of Washington may only have a handful of ads, making it unlikely for there to be a sufficiently large corpus of training data." CP at 7879. Further, it is difficult even for humans to precisely identify which ads, for example, "'indirectly'" appeal for "'financial or other support'" in a Washington election. CP at 7873 (quoting former RCW 42.17A.005(40)). "[E]ven attempting to create this set [of training data] would take a large amount of time (for example, to have multiple humans review and debate the instances that are challenging to classify) with no guarantee of it being successful or stable." CP at 7879.

"Meta can leverage the large number of advertisements that run on Facebook to create relatively stable training data that can then be used to develop machine learning classification algorithms to identify ads about 'social issues, elections or politics.'" CP at 7880. "This process could not easily be replicated for the identification of Washington Political Ads specifically" because "the difficulties with creating an initial, stable set of data for classifying Washington Political Ads is augmented by the necessity of having the machine constantly learn new information while 'forgetting' information that quickly becomes irrelevant as (for example) candidates drop out of local and statewide races." *Id.* Thus, Dr. Weber opined that

"using machine learning to identify Washington Political Ads specifically would be far more challenging to implement than Meta's current process to use machine learning to identify ads about 'social issues, elections or politics.'" *Id.*

In addition to Dr. Weber's declaration, Meta presented additional evidence to rebut the State's assertion that it could easily alter its Ad Library to display the requested information. Deposition testimony from Ani Vanesyan explained that the financial and technical burden of altering Meta's Ad Library to display the required information for Washington political ads would be "substantial and significant" and "nontrivial." CP at 8370. Moreover, altering the Ad Library "could also challenge the stability of the tool, because the more complex the code becomes on the back end, the more unstable the tool is." *Id.*

At the summary judgment stage, we view the evidence in the light most favorable to the nonmoving party. Here, nonmoving party Meta has provided evidence that it cannot identify covered ads without significant and ongoing expenditures of time and money. It has provided evidence that using machine learning—alone or with other review systems—to identify Washington political ads is not feasible. These facts—which conflict with the State's assertions—are highly relevant and material to whether the burden the law places on Meta's First Amendment rights and the chilling effect the law has on political speech are justified.

27

ii. Meta has set forth nonspeculative facts that responding to requests within 48 hours is unduly burdensome

Meta has also provided sufficiently specific evidence to support its argument that responding to disclosure requests within 48 hours—no matter how many ads the request covers, and no matter who requests the ad and for what purpose—is not narrowly tailored and is unduly burdensome.

Dr. Weber explained that producing responsive data upon request under the timelines imposed by the FCPA "requires the use of considerable resources" within Meta and through external contractors. CP at 7881. Determining "the universe of ads for which data is being requested" is difficult because requesters are not required to specifically identify the ads for which they seek information. CP at 7882-83. Meta employees and outside contractors must then formulate a query to retrieve the requested ads and review the retrieved ads to ensure that they really are Washington political ads and that they really do contain the relevant information; this is "a time-intensive process, especially because the results of the data query can sometimes constitute hundreds of pages for a single advertiser." CP at 7884. Next, contractors review the compiled data "to identify sensitive data or any information outside the scope of the Washington Disclosure Law, and then redact[] such data." *Id.* The legal team engages in a final review of the data and sends it to the requester. CP at 7885.

28

Meta has presented sufficiently specific evidence that doing all of this within the FCPA's timeline (48 hours under the current version of the regulation) is burdensome, in conflict with the State's claim that Meta could easily and inexpensively comply with the law.

The lead opinion does not address this argument, concluding instead that Meta loses because it did not "quantify the resources needed to comply" with the law. Lead opinion at 26-27. Even though Meta has not assigned specific dollar amounts to the burden it faces in complying with the disclosure law, it has described those burdens with sufficient detail to survive summary judgment. The disputed evidence regarding the burden on Meta should be resolved by a fact finder.

II.   THE LEAD OPINION'S "PER AD, PER REQUEST" APPROACH TO CALCULATING THE NUMBER OF FCPA VIOLATIONS CORRECTLY RECOGNIZES THAT THE LAW REQUIRES PLATFORMS TO COLLECT, MAINTAIN, AND DISCLOSE INFORMATION ABOUT INDIVIDUAL ADS AND DISCLOSE THAT INFORMATION IN RESPONSE TO SPECIFIC REQUESTS

The next issue is one of statutory interpretation: what counts as a "violation" under former RCW 42.17A.750(1)(c) (2019)? We review questions of statutory interpretation de novo, with a "fundamental objective" to ascertain and carry out the legislature's intent. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). We "discern[] legislative intent

from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Ass'n of Wash. Spirits & Wine Distribs.*, 182 Wn.2d at 350 (citing *Campbell & Gwinn*, 146 Wn.2d at 9-10). We may turn to other tools of statutory interpretation if the statute's plain meaning is ambiguous. *Five Corners Fam. Farmers v. State*, 173 Wn.2d 296, 306, 268 P.3d 892 (2011).

The penalty provision of the disclosure law provides that a "person who violates any of the provisions of this chapter may be subject to a civil penalty of not more than ten thousand dollars for each violation." Former RCW 42.17A.750(1)(c) (2019). The superior court may treble damages if "the violation is found to have been intentional." Former RCW 42.17A.780.

That's a significant potential penalty per violation. But the law does not define what constitutes a "violation." Instead, it specifies what does not constitute a violation by excluding "a violation of this chapter that is not a remediable violation, minor violation, or an error classified by the [PDC] as appropriate to address by a technical correction." Former RCW 42.17A.005(54).

The lead opinion, concurrence/dissent, and Meta each present different interpretations of the statutory term "violation." While I think this is a close question,

I agree with the lead opinion that the most reasonable interpretation of the statute is that a violation of the disclosure law occurs each time a platform fails to make required information about an advertisement available to a requester. That is the interpretation that best comports with the text and the legislature's stated intent to maximize disclosure and incentivize compliance.

The language of the law obligates Meta to collect, maintain, and disclose information about *each* covered advertisement. Former RCW 42.17A.345(1) (advertiser must maintain current books of account and related materials and make them available for public inspection); WAC 390-18-050 (contents of books of account include information about each specific advertisement). Thus, it makes sense to conclude that Meta violates the law *each time* it fails to disclose information about any particular ad in response to a request.

The lead opinion also persuasively reasons that its interpretation best supports the legislature's repeatedly stated intent to ensure full disclosure of campaign expenditures and its mandate to construe the FCPA "liberally" to promote that goal. Former RCW 42.17A.001(1), (11) (2019). The lead opinion also points out that a statement of intent related to former RCW 42.17A.005 states that the legislature intends "to promote greater transparency for the public by enhancing penalties for violations." LAWS OF 2011, ch. 145, §1. If the harm is deprivation of information

31

about an ad, that harm occurs each time a platform fails to disclose the information in response to a request; allowing the platform to be penalized each time this harm occurs seems to comport with legislative intent.

Meta argues that the disclosure law requires it to make information available "promptly upon request," former WAC 390-18-050(3), so that each time it fails to promptly comply with a bundled request counts as a single violation. Thus, Meta argues that in this case, the court should have counted a maximum of 12 violations, corresponding to each separate request made by the three individuals. Meta's interpretation can be described as counting the violations "per request."

The concurrence/dissent focuses on the law's requirement that platforms maintain specific information about each advertisement, prior to and independent of any later request for that information. It concludes that this means that the legislature made a platform's failure to disclose the required information "result[] in one violation for each advertisement, regardless of the number of requests for that same information." Concurrence/dissent at 15. The concurrence/dissent concludes that the disclosure law does not impose penalties "per request." *Id.*

In my view, both Meta and the concurrence/dissent fail to acknowledge all parts of the disclosure law. Meta's approach ignores the law's requirement that platforms maintain and disclose information about each advertisement. The

32

concurrence/dissent ignores the law's requirement that the platform must make the

information available each time it is requested.

The correct interpretation must acknowledge that the law requires platforms

to both maintain specific information *and* to make that information available for

public inspection. Further, as the lead opinion points out, the legislature repeatedly

emphasized its intent to maximize disclosure. Taken together, the most reasonable

interpretation of the law is that the harm (depriving voters of required campaign

finance information) occurs each time a platform fails to disclose the information

upon request.[14]

---

[14] This "per ad/per request" approach is how I interpret the lead opinion's statement that a platform commits a violation "for each advertisement it fails to disclose to the public when a request is made." Lead opinion at 33. The lead opinion says that its approach aligns with the way the superior court calculated the number of violations, which it describes as being "based on the number of advertisements where Meta failed to disclose the required information." *Id.* at 30. But that's an incomplete explanation of what the superior court did. Instead, the superior court counted the number of advertisements for which Meta failed to disclose the required information and multiplied that by the number of requests for the same information. The superior court reached its total of 822 violations by counting 411 violations relating to ads covered by Sanders' and Trask's requests, then doubling that number because Wurtz's requests also covered those same 411 ads. CP at 5801. This reflects a "per ad/per request" approach. However, the superior court's calculation was underinclusive because Wurtz's request covered far more than the 411 ads also covered by the two other individuals' requests. *See* CP at 5574 (order) (in July 2021, Wurtz requested to inspect the file for "'every political ad shown in Washington state since 2016,'" and the State established that since 2018, the number of Washington political ads included in Meta's Ad Library "exceeds 1,600"). The lead opinion notes this discrepancy, but provides no explanation as to why the superior court chose to calculate violations this way or how

33

Thus, I agree that the lead opinion's "per ad, per request" interpretation is probably the most reasonable way to interpret the penalty statute.[15] Here, even if the superior court correctly totaled the number of violations at 822, that still leaves open the question of whether the penalty imposed in this case violates the Eighth Amendment's prohibition on excessive fines. As I discuss next, under controlling Supreme Court precedent, the penalty imposed in this case—the highest one ever for a campaign disclosure violation—clearly violates the Eighth Amendment's bar on excessive fines.

III.   THE TRIAL COURT'S IMPOSITION OF A $35 MILLION PENALTY ON META FOR PARTIAL REPORTING VIOLATIONS VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION ON EXCESSIVE FINES

The Eighth Amendment to the United States Constitution prohibits excessive fines. A fine is "excessive" if it is "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). To determine gross disproportionality, we consider

---

the superior court's approach serves legislative intent instead of being arbitrary or underinclusive. Lead opinion at 28 n.15.

[15] A statute is ambiguous "if it can be reasonably interpreted in more than one way. However, it is not ambiguous simply because different interpretations are conceivable." *State v. Watson*, 146 Wn.2d 947, 954-55, 51 P.3d 66 (2002) (citing *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001)). For the reasons above, in light of the language and context of the law, the per ad/per request approach is reasonable, and the competing interpretations are not. Even if the law were truly ambiguous, application of the rule of lenity here would not shed much light on the legislative intent.

the factors set forth in the seminal United States Supreme Court case on excessive fines, *Bajakajian*: "'(1) the nature and extent of the [violation], (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused.'" *State v. Grocery Mfrs. Ass'n* (*GMA* I), 195 Wn.2d 442, 476, 461 P.3d 334 (2020) (quoting *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (citing *Bajakajian*, 524 U.S. at 337-40)); *see also City of Seattle v. Long*, 198 Wn.2d 136, 163, 493 P.3d 94 (2021) (courts apply the *Bajakajian* analysis to punitive civil fines).

Meta argues that the $35 million judgment here—the largest in the history of the state by a wide margin—is excessive and disproportional to the gravity of its disclosure violations under the *Bajakajian* factors. The lead opinion disagrees.

The lead opinion, however, fails to properly consider the *Bajakajian* factors. First, the lead opinion provides little analysis of the "nature and extent" of Meta's violations and characterizes Meta's misconduct at far too high a level of abstraction. Second, the lead opinion treats the fact that Meta's violations were unrelated to other legal violations as irrelevant—but instead, that factor actually weighs in favor of finding the penalty excessive. Third, the lead opinion also states that *Bajakajian*'s third factor, the other penalties that may be imposed for the violation, is irrelevant—but, instead, that factor also weighs in favor of finding the penalty excessive. Finally,

the lead opinion fails to consider the extent of the harm caused by Meta's violations, again viewing the harm at an erroneously extreme level of abstraction.

Under a proper analysis of the *Bajakajian* factors, the $35 million penalty is grossly disproportionate to Meta's conduct: failing to disclose *some of* the required information about political advertisements while disclosing much of the rest of the required information in its well-organized, conspicuously posted Ad Library. But before addressing each *Bajakajian* factor, I begin by reviewing some key cases on excessive fines.

> *A. A fine is excessive under the Eighth Amendment if it is grossly disproportionate to the gravity of the offense*

In *Bajakajian*, Hosep Bajakajian attempted to leave the country without reporting that he was transporting more than $10,000 in currency, as required by federal law. 524 U.S. at 324-25. Because he willfully violated that reporting requirement, the entire sum he was carrying—over $350,000—was subject to forfeiture. *Id.* at 325 (citing 18 U.S.C. § 982(a)(1)). The United States Supreme Court ruled that full forfeiture of Bajakajian's money would be grossly disproportionate to the gravity of the willful reporting offense he committed.

The Court considered several facts in reaching that conclusion. First, Bajakajian's "crime was solely a reporting offense." *Id.* at 337. Second, the violation

was "unrelated to any other illegal activities"; Bajakajian obtained the money legally and planned to use it to pay a lawful debt. *Id.* at 337-38.

Next, the Court considered Bajakajian's exposure under the federal sentencing guidelines: he could receive a maximum criminal sentence of six months, and a maximum fine of $5,000. *Id.* at 338. The Court compared this relatively low fine and low sentence to the maximum penalties authorized under the statute: "a maximum fine of $250,000 plus five years' imprisonment for willfully violating the statutory reporting requirement." *Id.* at 339 n.14. The Court concluded that the penalties Bajakajian actually faced, compared to the potential penalties for the worst offenders, "confirm a minimal level of culpability." *Id.* at 338-39.

Finally, the Court considered the harm Bajakajian caused. It rejected the government's contention that there was a correlation between the amount forfeited (over $350,000) and the harm the government would have suffered had the crime gone undetected. The Court instead focused on the actual harm caused by the defendant's violation: he deprived the government of the information that $357,144 had left the country, but he did not deprive the government of the money itself. *Id.* at 339. Requiring forfeiture of that amount "bears no articulable correlation to any injury suffered." *Id.* at 339-40.

*Bajakajian* did not establish a rigid test for determining whether a fine is excessive under the Eighth Amendment. *Long*, 198 Wn.2d at 167 (citing *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003)). This court adopted the Ninth Circuit's approach, which distilled the factors discussed in *Bajakajian* into the following nonexclusive list: "'"(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused."'" *Id.* at 167 (quoting *GMA* I, 195 Wn.2d 476 (quoting *$100,348.00 in U.S. Currency*, 354 F.3d at 1122)).

We applied that analysis in *GMA* II. 198 Wn.2d 888. GMA, a trade group, created a segregated account to hold and disburse funds from its members to oppose an initiative that required GMO labels on packaged food. GMA ultimately collected over $14 million for this purpose. *Id.* at 894. GMA did not register as a political action committee or make any reports to the PDC until after the State filed a lawsuit against it for FCPA violations.

After a bench trial, the court found that GMA had intentionally violated Washington's campaign finance laws. *Id.* at 895. It found that GMA intended "'to shield the contributions made from GMA members from public scrutiny'" and to bypass the FCPA's requirement to publicly disclose GMA members' contributions

on state campaign finance disclosure reports. *Id.* (quoting court papers). The

trial court imposed a base penalty of $6 million under former RCW

42.17A.750(1)(f) (2013), and, since the violation was intentional, trebled the

damages under former RCW 42.17A.780. That resulted in a penalty of $18 million,

at the time the largest campaign finance violation penalty in state history.

GMA argued that the penalty was unconstitutionally excessive. This court

affirmed the penalty after applying the *Bajakajian* factors. *Id.* at 899.

As to the first factor, we explained that the nature and extent of GMA's

violation was "'intentionally concealing the true source of over $10 million in

campaign spending' and directly violating the core principles of the FCPA." *Id.*

(quoting court papers). While GMA's violation was a reporting offense, it differed

significantly from the individual reporting offense in *Bajakajian*. We found that

GMA's "decision to conceal the identities of its campaign contributors struck at the

core of open and transparent elections" because "voters have the right to 'know of

the financing of political campaigns.'" *Id.* at 901 (quoting former RCW

42.17A.001(10)). Thus, the "grave nature and broad extent of GMA's offense

suggest[ed] the penalty is not grossly disproportional." *Id.* at 902.

As to the second factor, "GMA's conduct involved several illegal activities

that together amounted to failing to register and intentionally concealing the true

source of donations." *Id.* at 903. This also weighed in favor of a conclusion that the penalty was not grossly disproportionate.

Next, we considered the maximum penalties authorized by the legislature. *Id.* The FCPA had always permitted a base penalty for the amount concealed, as well as treble damages for intentional violations of campaign finance disclosure laws. *Id.* The maximum potential penalty that the court could have imposed on GMA under the statutes was thus "more than $43 million." *Id.* at 904. The fact that the court only imposed $18 million on GMA after considering mitigating factors also weighed in favor of finding that the penalty was not grossly disproportionate. *Id.*

Finally, we considered the extent of the harm caused. We rejected GMA's argument that "concealing its contributors caused minimal harm because voters knew that grocery manufacturers opposed the initiative." *Id.* Instead, we found the harm was "substantial and struck at the heart of the principles embodied in the FCPA" because "[v]oters are entitled to know who is contributing to political committees and paying for political campaigns by name, not just by category." *Id.* (citing former RCW 42.17A.001). We concluded that the penalty was not grossly disproportionate to GMA's bad conduct.

The principles derived from *Bajakajian* and applied in *GMA* II compel the conclusion that this $35 million fine is grossly disproportionate.

### B. Applying the Bajakajian factors, the $35 million penalty is grossly disproportionate to Meta's conduct and the actual harm caused

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334, 336-37 ("[C]ourts . . . must compare the amount of the [penalty] to the gravity of the defendant's offense."). Meta's violations stem from its failure to disclose some of the required information about Washington political ads as requested by three individuals across 12 requests. Under *Bajakajian*, the penalty must be *proportional to those violations*, not to abstract concerns about election integrity.

### i. Factor (1): The nature and extent of the violation

The lead opinion's Eighth Amendment analysis takes an abstract view of the violation. In fact, the lead opinion hardly mentions the specifics of Meta's violation at all in its Eighth Amendment analysis. Lead opinion at 35-38. It notes generally that Meta's actions "def[ied] the FCPA's strong goal of promoting transparency." *Id.* at 38. But that would be true of *any* violation of the FCPA; violating the act naturally defies the act's goals. The lead opinion says nothing about the proportionality of this

41

fine in relation to Meta's specific conduct: its failure to fully disclose some, but not all, of the required information about the ads requested.

Instead, *Bajakajian* requires us to consider the specific conduct giving rise to the violation. 524 U.S. at 337; *see also Thomas v. Humboldt County*, 124 F.4th 1179, 1193 (2024) ("'It is critical . . . that the court review the specific actions of the violator rather than by taking an abstract view of the violation.'" (quoting *Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020))), *cert. denied* 146 S. Ct. 27 (2025); *State v. Timbs*, 169 N.E.3d 361, 373 (Ind. 2021) (explaining that "focusing on the specific harms of specific acts," rather than "general statements" about the severity of a category of crime, aligns with *Bajakajian*'s analysis, which "pointed out that currency-reporting crimes might generally include serious violations by 'tax evaders, drug kingpins, or money launderers' but did not impute to the defendant the offenses of others and rather considered what specific harms his specific acts had caused"); *Commonwealth v. 1997 Chevrolet & Contents Seized from Young*, 639 Pa. 239, 265, 160 A.3d 153 (2017) ("In judging the gravity of the offense, we look to the culpability of the defendant rather than the severity of the crime in the abstract."

(citing *Commonwealth v. Real Prop. and Improvements Commonly Known as 5444 Spruce St.*, 574 Pa. 423, 432, 832 A.2d 396 (2003))).[16]

In this case, the "nature and extent" of Meta's violations show that a $35 million civil fine is grossly disproportionate.

If the superior court's calculation is correct, Meta failed to disclose *some* information about Washington political ads 822 times. But even so, Meta did provide *most* of the required information on its Ad Library, which is free and publicly available. The information that Meta disclosed on the Ad Library as well as in its responses to individuals' requests included the name of the ad purchaser and at least an estimate of the amount expended on the ad, as well as many other pieces of data that the law requires to be disclosed.

These facts immediately distinguish the case from *GMA* II. The nature and extent of GMA's violation was that of a political action committee intentionally, and completely, concealing the *identities* of campaign donors and the amounts of their

---

[16] There is a circuit split as to what level of abstraction is appropriate to apply when considering the nature and extent of the violation. *See* Pet. for Writ of Cert. to the Sup. Ct. of Alaska at 15-27, *Jouppi v. Alaska*, No. 25-246 (Aug. 29, 2025) (describing the split of authority), https://www.supremecourt.gov/DocketPDF/25/25-246/373224/20250829124919814_Jouppi%20v.%20State%20-%20Petition.pdf [https://perma.cc/55DK-MKX8]. But this court has already adopted the Ninth Circuit's approach, which rejects examining the *Bajakajian* factors at a high level of abstraction.

contributions. 198 Wn.2d at 904. We found that this "decision to conceal the identities of its campaign contributors struck at the core of open and transparent elections" because "voters have the right to 'know of the financing of political campaigns.'" *Id.* at 901 (quoting former RCW 42.17A.001(10)).

The nature of Meta's violations is much less severe, given that Meta did not conceal the identities of ad purchasers or the cost of advertisements and that it willingly disclosed most of the required information on a public website. Further, Meta stated that one reason it refused to disclose all the required information was that it was concerned about its users' privacy. *See* Am. Appellant's Opening Br. at 24-25 (Wash. Ct. App. No. 84661-2-I (2023)) (discussing privacy implications of disclosing location information for its users who view ads); *see also Bajakajian*, 524 U.S. at 326, 337 n.12 (noting the trial court's finding that respondent failed to report the currency due to "distrust of the government"—though that reason isn't mitigating, it is relevant, because it shows Bajakajian did not have a nefarious purpose in failing to report). This distinguishes Meta's conduct from GMA's: here, there is no indication that Meta intentionally concealed information about campaign donors and expenditures in order to shield them from public scrutiny.

And though the lead opinion criticizes Meta for failing to make a good-faith effort to comply with the law, Meta did take action to avoid violating the law. It

completely banned political ads in Washington, given its expectation about how difficult it would be to comply with the law.

Any violation of the FCPA hampers the FCPA's goals. But we must consider the specific conduct that constitutes the violation to determine whether the penalty is disproportionate. Here, Meta's failure to provide some of the information required to be disclosed differs greatly from GMA's intentional shielding of donor identity. This *Bajakajian* factor weighs in favor of finding the $35 million fine disproportionate to Meta's conduct.

ii.  Factor (2): Whether the violation was related to other illegal activities

The lead opinion asserts that "the second . . . factor[] [is] not relevant here as neither side argues that Meta's activities relate to other legal violations." Lead opinion at 37.

The lead opinion is wrong. The fact that Meta's activities do not relate to other violations actually weighs in favor of Meta here. Just as in *Bajakajian*, Meta's violation was purely a reporting violation. If it had disclosed the required information, there would have been no problem with Meta running the ads. And there is no suggestion that Meta refused to disclose the required information in connection with a larger plot (and other unlawful acts) by Meta to undermine

election transparency in Washington, as was the case in *GMA* II. 198 Wn.2d 903.

Because Meta's violations are isolated and not related to other legal violations, this

factor weighs in favor of concluding that a $35 million penalty is grossly

disproportionate to its conduct.

iii. Factor (3): The other penalties that may be imposed for the violation

The lead opinion asserts that the third factor is "not relevant here as neither

side argues . . . that other penalties (save for an injunction) may be imposed."

Lead opinion at 37.

This is incorrect. The FCPA penalty statute authorizes referral for criminal

prosecution for certain violations. For example, "A person who, with actual malice,

violates a provision of this chapter is guilty of a misdemeanor under chapter 9.92

RCW." Former RCW 42.17A.750(2)(a) (2019). A misdemeanor is punishable by

only 90 days in prison, or a fine of up to just $1,000, or both. RCW 9.92.030.

No one argues that Meta should be subject to criminal prosecution for its

violations, presumably because its culpability falls below "actual malice." The

potential criminal penalty for violating the statute—reserved for the most culpable

offenders—is limited to 90 days in jail and/or a $1,000 fine. RCW 9.92.030. And yet

Meta faces a $35 million penalty for a comparatively less culpable violation.

Another consideration is the fact that the trial court imposed the maximum statutory penalty ($10,000 per violation, trebled for an intentional violation) on each violation. But Meta's violations consisted of failing to disclose *some* required information, not withholding or concealing all information. And, as discussed above, Meta did not conceal the identities or expenditure amounts of ad purchasers, a key reason why this court found GMA's conduct so objectionable.

To be sure, the fact that a lesser penalty exists does not necessarily show that a fine is disproportionate. *GMA* II, 198 Wn.2d at 904 (citing *$100,348.00 in U.S. Currency*, 354 F.3d at 1122). But Meta's violations are less significant than the conduct at issue in *GMA*; hence, this factor tends to show that the fine was excessive.

iv. Factor (4): The extent of the harm caused

The final factor is the extent of the harm caused. The lead opinion describes that harm in the most generic terms possible. It acknowledges that "Meta did not outright hide the identity of political contributors" like GMA did, but it concludes without further analysis that Meta's actions "similarly defy the FCPA's strong goal of promoting transparency." Lead opinion at 37-38.

But when conducting a proportionality analysis, "generic considerations of harm" are "largely unhelpful" because "all crimes have a negative impact in some

47

general way to society." *1997 Chevrolet*, 639 Pa. at 299. As mentioned above, any disclosure-related violation of the FCPA will of course hinder the FCPA's goal of promoting disclosure. But to determine whether the penalty is grossly disproportionate, we must look closely at the actual harm caused by Meta's violations of the FCPA.

In this case, that actual harm is minimal, especially compared with the conduct in *GMA*. In *GMA* II, we held that the organization's intentional concealment of donor identities and amounts "was substantial" because "[v]oters are entitled to know who is contributing to political committees and paying for political campaigns by name." 198 Wn.2d at 904. Here, Meta did not withhold identities of ad purchasers or information about the cost of the ads. It published that information (with the cost represented as a range) on its Ad Library, available to the public. The extent of the harm caused by Meta's conduct is clearly significantly lower than the harm caused by GMA's conduct.

And while I disagree with Meta that the extent of the harm is "limited" to the three individuals whose requests were unfulfilled, the fact that only three people were deprived of requested information bears on the extent of the harm Meta caused. *See* lead opinion at 37 (quoting Suppl. Br. of Pet'r Meta Platforms, Inc. at 30-31).

Considering each of the *Bajakajian* factors, Meta's failure to disclose some, but not all, of the required information about political advertisements, even 822 times, is grossly disproportionate to the $35 million penalty. That is the State's—and country's—largest campaign finance penalty ever. But this is certainly not the State's—or the country's—largest campaign finance violation ever. It is not even a crime.

CONCLUSION

Political advertising is political speech. Whether we like the content of that speech or not, it is entitled to the highest protection. But even under the lead opinion's lower exacting scrutiny standard, a law like the FCPA that targets campaign speech must be narrowly tailored to serve an important government interest. One of the key factors we must examine in deciding whether the law is narrowly tailored is the burden that the law places on the regulated entity and the speech-chilling effects of the law more broadly. Here, Meta shows a genuine issue of material fact relating to the extent of the burden imposed by the disclosure law. I would therefore reverse the trial court's grant of summary judgment in favor of the State.

And even if the trial court correctly calculated the number of Meta's FCPA violations at 822, its $35 million civil penalty is grossly disproportionate to the offense and violates the Eighth Amendment.

I therefore respectfully dissent.

Gordon McCloud, J.

Johnson, J.

Madsen, J.P.T.